1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMAAL THOMAS,                              No.  2:11-cv-1138-MCE-EFB P

12                 Plaintiff,

13          v.                                   FINDINGS AND RECOMMENDATIONS

14   ANTIPOV, et al.,

15                 Defendants.

16

17          Plaintiff is a state prisoner proceeding without counsel in an action brought under 42

18   U.S.C. § 1983.  He alleges Eighth Amendment claims of deliberate indifference to serious

19   medical needs against each remaining defendant.  ECF No. 45.  Defendants have filed a motion

20   for summary judgment.  ECF No. 112-2.  Plaintiff filed an opposition to defendants' motion and a

21   counter-motion for summary judgment.  ECF No. 122.  For the reasons that follow, it is

22   recommended that (1) defendants' motion for summary judgment be granted as to defendants

23   Grinde, Ma, Maciel, McGee, and Park, but denied as to defendants Antipov and Downie, (2)

24   plaintiff's counter-motion for summary judgment be denied as to all defendants, and (3)

25   plaintiff's request for judicial notice be denied.

26   /////

27   /////

28   /////

1

1    I.      **BACKGROUND**

2         This action proceeds on plaintiff's verified second amended complaint filed May 7, 2012.

3    ECF No. 45 ("SAC") at 1, 16.[1]  Plaintiff alleges that defendants Antipov, Downie, Grinde, Ma,

4    Maciel, McGee, and Park were deliberately indifferent to his serious medical needs before,

5    during, and after the extraction of his wisdom teeth.  *Id.* at 1, 12.  Antipov is an oral surgeon who

6    performed the extractions while working for the California State Prison, Sacramento as an

7    independent contractor.  Downie, Park, and Maciel are dentists.  Ma is a physician.  McGee and

8    Grinde are registered nurses.

9         Defendant Antipov removed plaintiff's four wisdom teeth on August 3, 2010.  *Id.* at 4.

10   According to plaintiff, he informed Antipov before the extractions that he needed to be pre-

11   medicated with antibiotics before every dental procedure because of his heart murmur, but neither

12   the dental staff nor Antipov had plaintiff's medical files on hand to confirm plaintiff's contention.

13   *Id.*[2]  Before the extraction, plaintiff was given a Dental Health Record form to complete that

14   asked him to list all medication allergies.  Pl.'s Decl. at ¶ 10 (ECF No. 122 at 76).  Plaintiff

15   signed this form before it was completed because the nurse assisting him "made it confusing."  *Id.*

16   The nurse wrote "Motrin" before returning the form to plaintiff and spelling "Tylenol" and

17   "Penicillin" for him to add to the form.  *Id.*  Plaintiff says it was difficult for him to understand

18   the nurse, who took the form back out of frustration, saying she would add Aspirin and Naproxen.

19   *Id.*  Nevertheless, though the form he signed on the day of the extraction listed only an allergy to

20   Motrin, plaintiff claims that his Unit Health Record "has [had] allergies to Tylenol, Penicillin,

21   Aspirin, [and] Motrin written on it since [his] arrival to prison."[3]  *Id.* at ¶ 30 (ECF No. 122 at 81).

22   ─────────────────────

23        [1] For ease of reference, all citations to court documents are to the pagination assigned via
     the court's electronic filing system.

24        [2] According to plaintiff, a doctor diagnosed him with a heart murmur on May 14, 2008.
     ECF No. 122 ("Pl.'s Decl.") at ¶ 4.  That doctor ordered plaintiff to take prescribed antibiotics
25   thirty minutes before any dental surgery.  *Id.*  Other doctors made that same recommendation on
     January 16, March 5, and March 17, 2009.  *Id.* at ¶ 6.  Additionally, defendant Downie added that
26   recommendation to plaintiff's progress notes on December 22, 2009.  *Id.* at ¶¶ 7, 8.

27        [3] Plaintiff has not submitted this Unit Health Record to the court.

28

2

1        Antipov injected plaintiff with local anesthesia before the extraction.  Pl.'s Decl. at ¶ 11

2  (ECF No. 122 at 76).  Plaintiff claims that his heart began to beat rapidly and he experienced cold

3  chills moments later.  *Id.*  Plaintiff describes the procedure as protracted and problematic.  He

4  asserts that Antipov showed no concern for plaintiff's well-being, left "mouth hinges"[4] in

5  plaintiff's mouth for the entire two-hour procedure, and failed to prescribe necessary antibiotics

6  and pain medication.  SAC at 4.  Plaintiff claims that Antipov struggled to remove plaintiff's left

7  and lower right wisdom teeth, and he became "frustrated to [the] point that he applied immense

8  pressure, that [plaintiff's] whole head was being pulled to and fro."  *Id.*  Plaintiff claims that

9  Antipov ignored plaintiff's complaints of pain, Pl.'s Decl. at ¶ 12, and that because the procedure

10  took longer than expected, plaintiff was rushed out of the dental office without receiving any pain

11  medication, SAC at 4.   Plaintiff also asserts that Antipov later stated that the surgery was

12  difficult.  Pl.'s Decl. at ¶ 86 (ECF No. 122 at 91).

13        Later on the day of the extractions, plaintiff experienced extreme pain, difficulty

14  breathing, a rapid heartbeat, chest pain, and a fever.  *Id.*  Correctional officers took plaintiff to the

15  prison medical facility after he suffered a seizure.  SAC at 5.  There, he spoke with defendant

16  McGee, a nurse, who filled out and signed a form indicating that plaintiff's pain level was ten out

17  of ten.  Pl.'s Decl. at ¶ 71 (citing Ex. E to Pl.'s Opp'n).  McGee contacted the on-call doctor, but

18  allegedly was openly disrespectful towards plaintiff.  SAC at 5.  Plaintiff asserts that he had a

19  temperature of 102.5 degrees, but McGee did not offer any medical assistance.  *Id.*  He further

20  claims that McGee "jammed her fingers down [plaintiff's] throat in search of" gauzes that

21  plaintiff might have swallowed during his seizure.  *Id.*  Though McGee could not locate any

22  gauzes, two correctional officers were able to.  *Id.*  According to plaintiff, McGee's actions

23  caused him great pain.  *Id.*  When the on-call doctor arrived, he observed plaintiff's state and

24  contacted Burns, a dentist.  *Id.* at 5-6.[5]  Upon learning that plaintiff had not received any pain

25  medication after the extraction, Burns provided liquid pain medication, prescribed liquid Vicodin,

26

     [4]  In his declaration, plaintiff adopts Antipov's terminology and refers to them as "bite

27  blocks."  Pl.'s Decl. at ¶ 12.

28       [5] Burns is not a defendant in this case.

1    scheduled plaintiff for an appointment with a prison dentist the following morning, and sent

2    plaintiff to the Outpatient Housing Unit ("OHU") to be monitored throughout the night.  *Id.* at 6.

3         At OHU, plaintiff met with defendant Ma, the on-call doctor.  *Id.*  But plaintiff claims that

4    instead of examining or treating plaintiff, Ma left him in the cell suffering.  *Id.*  When the pain

5    became unbearable, plaintiff banged on his door and requested the liquid Vicodin that Burns had

6    ordered.  *Id.*  An hour later, a nurse informed plaintiff that the OHU did not carry liquid Vicodin,

7    and tried to give plaintiff the Tylenol #3 that Ma had ordered.  *Id.*  Plaintiff told both Ma and the

8    nurse that he could not take Tylenol, Aspirin, Penicillin, Naproxen, Ibuprofen, or Motrin.  *Id.*

9    Plaintiff, without having seen a dentist in OHU, was sent back to his cell at approximately 2:00

10   p.m. the following day.  *Id.* at 7.

11        Plaintiff was not seen by a dentist until August 10.  *Id.*  Throughout the preceding week

12   plaintiff was taking medication that he assumed he was not allergic to, as he had informed Ma of

13   his medication allergies.  *Id.*  The Tylenol #3 and Penicillin were "crushed down into water" and

14   plaintiff "did not know that Liquid T-3 stood for Tylenol #3 . . . ."  Pl.'s Decl. at ¶¶ 34, 35 (ECF

15   No. 122 at 82).  But plaintiff was having an allergic reaction to the medication, experiencing chest

16   and heart pain, rashes, a swollen face, hives, diarrhea, bloody stool, continuous vomiting,

17   migraines, ear aches, fatigue, difficulty breathing, and dehydration.  SAC at 7.  The dentist

18   appointment on August 10 was not for these issues or even a follow-up for his surgery, but rather

19   a scheduled tooth cleaning.  *Id.*  Defendant Downie, a dentist, retrieved plaintiff's medical file

20   upon observing plaintiff's swollen face.  *Id.*  Downie discontinued Ma's prescription and said that

21   he would prescribe pain medication that plaintiff could tolerate.  *Id.*  Downie also said that he

22   would have plaintiff return in a week.  *Id.*

23        Later that night, plaintiff received a bag of Tylenol that defendant Maciel, a doctor, had

24   prescribed.  *Id.*  Plaintiff returned the medication to the medical technician and informed her of

25   his "condition."  *Id.*  *But cf.* Pl.'s Decl. at ¶ 42 (ECF No. 122 at 83) (stating that he "took this

26   medication for a couple of days not knowing it was Tylenol.").  Plaintiff claims Maciel did not

27   check plaintiff's dental health history records to see what medications plaintiff was allergic to.

28   Pl.'s Decl. at ¶ 100 (ECF No. 122 at 93).

4

1    Plaintiff continued to experience extreme pain after August 10. *Id.* Every night, prison
2    staff would provide plaintiff with a bag of Tylenol, and plaintiff would inform them that he was
3    allergic to that medication. ECF No. 45 at 8, ¶ 17. Because plaintiff did not receive any other
4    medication, he was "forced to either take the medication that [he] was allergic to . . . or just suffer
5    through it all, in hopes of getting better . . . ." *Id.* On August 17, a nurse became very concerned
6    for plaintiff's health. *Id.,* ¶ 19. Upon learning of plaintiff's medication allergies, the nurse made
7    a bold notation in plaintiff's medical file. *Id.* The nurse also scheduled plaintiff for an
8    appointment with the dentist the following morning. *Id.*

9    But plaintiff did not meet with a dentist until August 20. *Id.,* ¶ 20. Upon seeing plaintiff's
10   condition and weight loss on that date, Downie prescribed Salsalate for plaintiff's pain. *Id.*
11   Downie did not prescribe anything for plaintiff's swollen face. *Id.* Downie did not examine
12   plaintiff's mouth because it was too painful for plaintiff to open his mouth. ECF No. 122 at 93,
13   ¶ 103. After informing Downie that he had not eaten anything since the extraction, plaintiff
14   requested that Downie place him on a liquid diet. ECF No. 45 at 8, ¶ 20. Downie replied that it
15   was not his department, but rather medical, that determines diet. *Id.* at 9. Medical, however, told
16   plaintiff that the dental department is responsible for that determination. *Id.* Plaintiff was not
17   placed on a liquid diet. *Id.* Because of the pain, plaintiff eventually took the Salsalate that
18   Downie prescribed. *Id.* Plaintiff also had an allergic reaction to that medication. *Id.* Upon
19   learning that Salsalate has Aspirin in it, plaintiff requested another medication. *Id.*

20   Plaintiff, "without receiving any pain medication," passed out on August 24. *Id.* He was
21   taken to the medical facility, where the nurse called defendant Park, a doctor. Park prescribed
22   Morphine for the night and scheduled a dentist appointment for plaintiff. *Id.*

23   On August 25, plaintiff had an appointment at San Joaquin General Hospital concerning
24   his heart murmur. *Id.* at 10. Because of that appointment, plaintiff was not able to attend the
25   dental appointment that Park had ordered. *Id.* Upon returning to the prison's A-facility to be
26   checked back into the institution, defendant Grinde, a nurse, approved plaintiff's return to B-
27   facility without any treatment. *Id.* Plaintiff's face was severely swollen, and he expressed to
28   Grinde that he was in severe pain. *Id.*; ECF No. 122 at 93, ¶ 104.

At B-facility, plaintiff refused to go back into his cell until he received treatment for his pain. SAC at 9. After plaintiff argued with medical staff for fifteen minutes, Grinde reported to B-facility. *Id.* Grinde stated that he could not do anything for plaintiff because plaintiff was just trying to get drugs. *Id.* When Grinde stated that he would provide Tylenol #3, plaintiff informed Grinde that he was allergic to that and other medications. *Id.* Grinde called Park, who again prescribed Morphine for the pain. *Id.* at 11. But Park also prescribed Tylenol #3 and Penicillin, despite knowing of plaintiff's allergies to those medications. *Id.* After plaintiff argued with both Grinde and Park, Park also prescribed Erythromycin for plaintiff's infection. *Id.*

On August 26, plaintiff met with Maciel. *Id.* Maciel prescribed plaintiff liquid Methadone, continued the Erythromycin treatment, ordered plaintiff a liquid diet, and scheduled plaintiff for an appointment with the oral surgeon. *Id.* Maciel then prescribed a stronger antibiotic and called plaintiff in everyday to receive an oral rinse to treat the infection. *Id.* at 12.

Plaintiff is still "suffering from the effects of this whole ordeal," as his jaw unhinges when he chews and hurts when he speaks. SAC at 12. Specifically, plaintiff claims that Antipov's extraction caused "TMJ, a dislocated disk in [plaintiff's] jaw and a deviation" in plaintiff's jaw. Pl.'s Decl. at ¶ 76. Additionally, his heart condition "worsened tremendously" as a direct result of the extraction and the medical care he received afterwards, SAC at 12, and he lost weight as a result of not being able to eat from August 3 until the first week of September, Pl.'s Decl. at ¶ 13.[6]

---

[6] Plaintiff also makes several medical claims based on documents he has filed with the court. However, those documents do not support the claims that plaintiff derives from them. For example, plaintiff contends that a heart murmur consultation on June 18, 2013, "showed that [he] was at risk of encocaditis[,] a heart disease that is caused from not being pre[-]medicated before oral surgery and an infection from oral surgery getting into the bloodstream traveling to the heart." Pl.'s Decl. at ¶ 82 (citing "Exhibit W" to Pl.'s Opp'n). Additionally, plaintiff claims the extraction caused TMJ, trismus, a displaced disk, and risk of osteomylitis, and that at an appointment on June 18, 2014, a doctor explained to plaintiff that his current heart condition was "impacted from" Antipov's surgery. *Id.* at ¶ 83, 84 (citing "Exhibit X" to Pl.'s Opp'n).

However, the court has reviewed both Exhibits W and X and finds that neither "shows" nor even mentions the causation that plaintiff claims. Exhibit W consists of dental progress notes from March 1 and May 16, 2011. The note dated March 1 indicates plaintiff's "jaw doesn't pop anymore" and "opens freely without pain." ECF No. 122 at 176. The note dated May 16 states: "Having soreness on right side of jaw. Palpation on right TMJ—he states he has pain—open is

## II.     STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994).  At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)  (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures.  Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own.  When the

limited[.]  Bite is normal.  No swelling or [illegible] present[.]  He said pain has decrease[d.]"  *Id.* at 177.  Exhibit X is a dental progress note from August 3, 2010 (i.e., the day of the extraction).  *Id.* at 179.

1    opposing party would have the burden of proof on a dispositive issue at trial, the moving party

2    need not produce evidence which negates the opponent's claim.  *See, e.g., Lujan v. National*

3    *Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  Rather, the moving party need only point to matters

4    which demonstrate the absence of a genuine material factual issue.  *See Celotex*, 477 U.S. at 323-

5    24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a

6    summary judgment motion may properly be made in reliance solely on the 'pleadings,

7    depositions, answers to interrogatories, and admissions on file.'").  Indeed, summary judgment

8    should be entered, after adequate time for discovery and upon motion, against a party who fails to

9    make a showing sufficient to establish the existence of an element essential to that party's case,

10   and on which that party will bear the burden of proof at trial.  *See id.* at 322.  In such a

11   circumstance, summary judgment must be granted, "so long as whatever is before the district

12   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

13   satisfied."  *Id.* at 323.

14          To defeat summary judgment the opposing party must establish a genuine dispute as to a

15   material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s) that

16   is material, i.e., one that makes a difference in the outcome of the case.  *Anderson*, 477 U.S. at

17   248 ("Only disputes over facts that might affect the outcome of the suit under the governing law

18   will properly preclude the entry of summary judgment.").  Whether a factual dispute is material is

19   determined by the substantive law applicable for the claim in question.  *Id.*  If the opposing party

20   is unable to produce evidence sufficient to establish a required element of its claim that party fails

21   in opposing summary judgment.  "[A] complete failure of proof concerning an essential element

22   of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S.

23   at 322.

24          Second, the dispute must be genuine.  In determining whether a factual dispute is genuine

25   the court must again focus on which party bears the burden of proof on the factual issue in

26   question.  Where the party opposing summary judgment would bear the burden of proof at trial on

27   the factual issue in dispute, that party must produce evidence sufficient to support its factual

28   claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.

1    *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit

2    or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue

3    for trial.  *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076.  More significantly, to

4    demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such

5    that a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*,

6    477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

7            The court does not determine witness credibility.  It believes the opposing party's

8    evidence, and draws inferences most favorably for the opposing party.  *See id.* at 249, 255;

9    *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the

10   proponent must adduce evidence of a factual predicate from which to draw inferences.  *American*

11   *Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J.,

12   dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at

13   issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th

14   Cir. 1995).  On the other hand, the opposing party "must do more than simply show that there is

15   some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

16   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

17   trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant

18   summary judgment.

19           Concurrent with their motion for summary judgment, defendants advised plaintiff of the

20   requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.

21   ECF No. 112-1; *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d

22   952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999); *Klingele v. Eikenberry*,

23   849 F.2d 409 (9th Cir. 1988).[7]

24   /////

_____

25           [7]  Plaintiff requests that the court take judicial notice of Ninth Circuit cases that address

26   pro se litigants and the summary judgment standard.  ECF No. 123.  Supplemental authority is
     not an adjudicative fact subject to judicial notice under Federal Rule of Evidence 201.  A party

27   need not request judicial notice of published decisions, as simply citing such decisions in a brief
     is sufficient.  Accordingly, the undersigned recommends that plaintiff's request for judicial notice

28   be denied.

1    **III.    ANALYSIS**

2        **A.    Defendants' Motion for Summary Judgment**

3        Defendants argue that they are entitled to summary judgment because (1) plaintiff's

4    opposition does not comply with Local Rule 260(b), (2) plaintiff has not produced any evidence

5    of any defendant's deliberate indifference, and (3) they are entitled to qualified immunity.

6            **1.    Local Rule 260(b)**

7        Defendants argue that summary judgment is appropriate because plaintiff's opposition to

8    their motion for summary judgment does not comply with Local Rule 260(b).  That rule states:

9                Any party opposing a motion for summary judgment . . . shall
10               reproduce the itemized facts in the Statement of Undisputed Facts
                 and admit those facts that are undisputed and deny those that are
11               disputed, including with each denial a citation to the particular
                 portions of any pleading, affidavit, deposition, interrogatory
12               answer, admission, or other document relied upon in support of
                 that denial.
13

14   E.D. Cal. L.R. 260(b).  In his opposition, plaintiff repeats many of the allegations in his second

15   amended complaint, maintains his own account of the facts in this case, and includes his own

16   "Separate Statement of Disputed Facts."  ECF No. 122 at 51-62.  Plaintiff's filing satisfies the

17   core purpose for requiring an annotated statement of facts in that it sufficiently identifies the facts

18   that plaintiff disputes and, importantly, cites to the specific material in the record that plaintiff

19   relies upon for the factual assertion.  The argument that this should all be moved to a separate

20   sheet of paper simply exalts form over substance.  Thus, defendants are not entitled to summary

21   judgment on the ground that plaintiff's opposition failed to comply with Local Rule 260(b).

22           **2.    Plaintiff's Eighth Amendment Claim**

23       Defendants also argue that they are entitled to summary judgment because plaintiff has

24   not produced any evidence of any defendant's deliberate indifference.

25       To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

26   plaintiff must establish that he had a serious medical need and that the defendant's response to

27   that need was deliberately indifferent.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see*

28

                                          10

1 *also Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to

2 treat the condition could result in further significant injury or the unnecessary and wanton

3 infliction of pain.  *Jett*, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial,

4 delay, or intentional interference with medical treatment, or by the way in which medical care is

5 provided.  *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

6    To act with deliberate indifference, a prison official must both be aware of facts from

7 which the inference could be drawn that a substantial risk of serious harm exists, and he must also

8 draw the inference.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if

9 he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing

10 to take reasonable measures to abate it."  *Id.* at 847.  A physician need not fail to treat an inmate

11 altogether in order to violate that inmate's Eighth Amendment rights.  *Ortiz v. City of Imperial*,

12 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition,

13 even if some treatment is prescribed, may constitute deliberate indifference in a particular case.

14 *Id.*

15    It is important to differentiate common law negligence claims of malpractice from claims

16 predicated on violations of the Eighth Amendment's prohibition of cruel and unusual punishment.

17 In asserting the latter, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not

18 support this cause of action."  *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.

19 1980) (citing *Estelle*, 429 U.S. at 105-06); *see also Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th

20 Cir. 2004).

21          **a.  <u>Antipov</u>**

22    Antipov seeks summary judgment on the ground that there is "no evidence that he was

23 deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 22.  Antipov's motion

24 is based on his declaration, in which he does not dispute that he removed plaintiff's four wisdom

25 teeth without premedicating him with antibiotics.  Antipov Decl. at ¶¶ 3, 5, 7.  Antipov also does

26 not dispute that he provided local anesthesia, *id.* at ¶ 6, but did not prescribe plaintiff pain

27 medication or antibiotics after the extraction.  *Id.* at P 10.  Antipov and plaintiff dispute whether

28 Antipov had the authority to do so.  Plaintiff claims that Antipov had such authority but was

1    deliberately indifferent in not prescribing medications necessary to address plaintiff's serious
2    medical needs.  ECF No. 122 at 12.  Antipov claims he did not prescribe plaintiff with either pain
3    medication or antibiotics after the extraction because, as an independent contractor not on the
4    medical staff at the prison, he is not permitted to prescribe medication to inmates.  *Id.* at ¶ 10.
5    "Instead, it is up to the medical staff at the prison, such as [plaintiff's] dentist, to prescribe such
6    medications following the wisdom tooth extraction."  *Id.*

7         Antipov's account differs from plaintiff's version of events in several other respects.
8    Antipov claims that he did in fact review plaintiff's medical chart before the extraction.  *Id.* at ¶ 4.
9    His review indicated that plaintiff had in fact previously been hospitalized with heart murmurs
10   but was not under treatment on the day of the extraction.  *Id.*  He contends however, that
11   premedicating plaintiff with an antibiotic would have been "unnecessary and inappropriate," and
12   notes that the American Heart Association and American Dental Association have not
13   recommended such premedication for individuals with heart murmurs since 2007.  *Id.* at ¶ 5.
14   Contrary to plaintiff's claim that Antipov struggled to remove some teeth, Antipov describes the
15   extraction of plaintiff's wisdom teeth as a "very routine" and "fairly easy" procedure.  *Id.* at ¶ 8.
16   Antipov asserts that the entire procedure took approximately twenty minutes, and plaintiff never
17   indicated to Antipov that he was in any discomfort.  *Id.*  Antipov explains that he did not place
18   any "hinges" in plaintiff's mouth, but rather used "bite blocks," which make the procedure more
19   comfortable for the patient.  *Id.* at ¶ 9.  According to Antipov, infections, slow-healing gums, and
20   pain and swelling in the gums and tooth socket are common side effects of wisdom tooth
21   extraction.  *Id.*

22        Thus, plaintiff and Antipov dispute whether Antipov reviewed plaintiff's medical chart
23   before the extractions and whether Antipov should have premedicated plaintiff with antibiotics.
24   They also dispute the length and difficulty of the extraction, whether Antipov ignored plaintiff's
25   complaints of pain, and—significantly—whether Antipov choice not to prescribe pain medication
26   and antibiotics despite knowing plaintiff's condition can constitute an Eighth Amendment
27   violation under these circumstances.  As noted, Antipov claims not to have had any authority to
28   prescribe plaintiff pain medication and antibiotics.

1      The dispute over Antipov's alleged failure to review plaintiff's medical chart before the

2 extraction appears to be of little consequence.  Plaintiff suggests that if Antipov had looked at the

3 medical chart he would have seen that other doctors had recommended that plaintiff premedicate

4 with antibiotics before any dental surgery.  Pl.'s Decl. at ¶¶ 4, 6-8.  Plaintiff has certainly

5 established a difference of opinion between he and Antipov and also between Antipov and other

6 doctors.  But the recommendation of other doctors was not binding on Antipov, who instead

7 relied on guidelines from the American Heart Association and the American Dental Association.

8 The Ninth Circuit has made clear that a difference of medical opinion is, as a matter of law,

9 insufficient to establish deliberate indifference.  *See Toguchi*, 391 F.3d at 1058.  "Rather, to

10 prevail on a claim involving choices between alternative courses of treatment, a prisoner must

11 show that the chosen course of treatment 'was medically unacceptable under the circumstances,'

12 and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'"  *Id.*

13 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).  Plaintiff has not shown that

14 Antipov's decision to not premedicate plaintiff with antibiotics was medically unacceptable under

15 the circumstances, nor that Antipov made that determination in conscious disregard of an

16 excessive risk to plaintiff's health; the American Heart Association and American Dental

17 Association guidelines that Antipov refers to suggest just the opposite.  Thus, neither the claim

18 that Antipov did not review plaintiff's medical chart nor the claim that Antipov should have

19 premedicated plaintiff with antibiotics establishes deliberate indifference.  Thus, the dispute over

20 review of the medical chart is not a dispute over a material issue of fact.

21      However, the disputes over the length and difficulty of the extractions, the level of

22 plaintiff's pain during and after the extractions, and what, if anything, Antipov did to address the

23 pain and potential for infection are material.  Plaintiff describes a prolonged and problematic

24 procedure during which Antipov became frustrated over the difficulty removing the left and right

25 lower wisdom teeth.  ECF No. 45, at 4 ¶ 4.  He describes Antipov having to apply "immense

26 pressure, that my whole head was being pulled to and fro."  *Id.*  He further adds that "[b]eing that

27 my procedure took longer than expected I was rush[ed] out of the dental office without receiving

28 any pain medication, even after I was notified that the anethesa [sic] wear off around 4:30 p.m.

1   (dinner time.)"  *Id.*  The dispute over whether plaintiff complained of pain and the subsequent

2   dispute over why Antipov did not prescribe pain medication for post-surgical pain that plaintiff

3   would reasonably be expected to suffer precludes a grant of summary judgment in Antipov's

4   favor.  A reasonable fact finder could certainly conclude on the evidence presented that Antipov

5   knew that the extractions would result in severe pain requiring treatment with pain medication.

6   Indeed, plaintiff asserts that he was warned that the injections used in the procedure would soon

7   wear off.  Likewise, a fact finder could reasonably conclude that Antipov was aware of the risk of

8   infection following the procedure.  *See* Antipov Decl. at ¶ 10 ("infections are also common side

9   effects, as extraction may allow bacteria to enter the bloodstream").   But, as noted above,

10  Antipov claims that "[s]ince approximately 2009, [he has] performed work as an independent

11  contractor and expert for the California Department of Corrections and Rehabilitation . . . ."  *Id.* at

12  ¶ 2.  Antipov believes that he was therefore not permitted to prescribe medication to inmates.[8]

13  *See id.* at ¶ 11.  However, as an independent contractor, Antipov quite clearly had the authority to

14  prescribe medication to inmates:

15
16          Only facility-employed health care staff, *contractors paid to*
           *perform health services* for the facility, or persons employed as
           health care consultants shall be permitted within the scope of their
17          licensure, to diagnose illness or, prescribe medication and health
           care treatment for inmates.  No other personnel or inmate may do
18          so.

19  Cal. Code Regs. tit. 15, § 3354(a) (emphasis added).  Thus, contrary to Antipov's alleged

20  mistaken belief—one that he appears to have held since 2009—Antipov had the authority to

21  prescribe medication within the scope of his license to treat plaintiff's pain and risk of infection.

22  A defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and

23  disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.

24  Antipov's choice not to prescribe medication, while seemingly ill-informed, was indisputably

25  deliberate.  Further, he does not deny that prescribing such medication was medically indicated to

26  _____

27          [8]  In support of this position, Antipov's reply brief cites his Statement of Undisputed Facts
       numbers 26 and 27 (ECF No. 112-3 at 4), which in turn cite to paragraph 11 of his declaration.
       His declaration, however, fails to cite any authority for the assertion that as a contractor he was
28     not authorized to prescribe medication.

1    address or treat a serious medical condition.  Instead, the reason he articulates for not doing so is

2    his erroneous assertion that he lacked authority to prescribe medication even if needed.

3            Notwithstanding the clear language of section 3354(a), Antipov still insists in his reply

4    brief that he lacked authority to prescribe medication.  Antipov's stated belief that he could not

5    prescribe medication even under circumstances that otherwise warrant such treatment raises the

6    question of whether his deliberate, but allegedly ill-informed decision not prescribe medically

7    necessary medication can satisfy the test under *Farmer* for deliberate indifference.  That question

8    turns on fact-specific issues of what Antipov knew not only as to plaintiff's immediate medical

9    needs but what he knew as to the authority of medical practitioners to respond to those needs, and

10   what other steps Antipov had available to respond to plaintiff's serious medical needs.  The issue

11   that requires submission to a jury, however, is not whether Antipov had the authority to prescribe

12   medication; he did.  Cal. Code Regs. tit. 15, § 3354(a).  Rather, the issue that precludes summary

13   judgment is whether Antipov was deliberately indifferent for not prescribing any pain medication

14   or antibiotics after extracting plaintiff's wisdom teeth or otherwise taking steps to assure that such

15   treatment would be provided.  As noted above,

16
17              Whether a prison official had the requisite knowledge of a
               substantial risk is a question of fact subject to demonstration in the
18             usual ways, including inference from circumstantial evidence, and
               a factfinder may conclude that a prison official knew of a
19             substantial risk from the very fact that the risk was obvious.

20   *Farmer*, 511 U.S. at 842.  More succinctly: "a trier of fact may infer knowledge from the obvious

21   . . . ."[9] *Id.* at 844; *see also Harrelson v. Dupnik*, 970 F. Supp. 2d 953, 979 (D. Ariz. 2013) ("The

22   question is whether the risk of harm . . . was so 'obvious' that ignoring it amounted to deliberate

23   indifference.").  Similarly, a fact finder need not ignore evidence that may show it was obvious

24   that a contractor for medical services had the authority for which Antipov claims not to have

25   known.

26   _____

27         [9] While the court in *Farmer* adopted a subjective test under which a jury must conclude
     that Antipov had knowledge of the risk from his failure to act before liability may be imposed, it
     is for the jury to resolve credibility and decide what he actually knew, and in doing so the jury
28   need not ignore what was obvious.  511 U.S. at 843, n.8.

1    Here, a fair-minded jury could find that not prescribing pain medication or antibiotics

2    after extracting plaintiff's wisdom teeth posed a substantial risk of serious harm to plaintiff, that

3    Antipov had to have known of such an obvious risk, and that Antipov failed to take reasonable

4    measures to abate that risk.  Because those findings could lead a fair-minded jury to return a

5    verdict for plaintiff on the evidence presented, Antipov's motion for summary judgment must be

6    denied.

7                                **b. Ma**

8    Ma also argues that there is "no evidence that he was deliberately indifferent to

9    [plaintiff's] medical needs." ECF No. 112-2 at 22.  Ma submits a declaration acknowledging that

10   he was the on-call doctor on the evening of August 3.  Ma Decl. at ¶ 3.  However, Ma states that

11   before he even arrived at the medical clinic, he issued an order that plaintiff be seen on the dental

12   line the following morning.  *Id.*  When he arrived at the medical clinic a short time later, he

13   conducted an examination that confirmed plaintiff was awake and orientated; Ma diagnosed

14   plaintiff with somnolence of an unknown etiology.  *Id.* at ¶¶ 4, 5.  Ma also ordered that plaintiff

15   be admitted to OHU, where the nursing staff was to monitor plaintiff's vital signs every thirty

16   minutes for four hours and then every two hours for three hours.  *Id.* at ¶ 6.  Ma claims that he

17   reviewed plaintiff's medical chart during the examination.  *Id.* at ¶ 7.  That review indicated that

18   Burns had prescribed Tylenol #3 and Penicillin for plaintiff.  *Id.*  Ma ordered that prescription to

19   continue because neither Burns's order nor plaintiff's medication reconciliation form listed

20   allergies to those medications.  *Id.*

21   On August 4, nursing staff informed Ma that the prison did not have any liquid Tylenol #3

22   available, and that plaintiff's medication reconciliation form identified a drug allergy only to

23   Motrin.  *Id.* at ¶ 11.  Ma therefore prescribed Tylenol #3 in tablet form, three times per day for

24   four days.  *Id.*  Ma did not become involved in plaintiff's medical care again until 2013, when he

25   became plaintiff's primary care physician.  *Id.* at ¶ 13.  In Ma's review of plaintiff's medical

26   chart—both in 2010 and later as his primary care physician—Ma has not seen any indication that

27   plaintiff is genuinely allergic to any medication.  *Id.* at ¶ 14.  According to Ma, stomach

28   discomfort, nausea, and vomiting are fairly common side-effects of taking Tylenol #3 and not

                                        16

1    necessarily an indication that an individual cannot tolerate the medication.  *Id.* at 8.  Moreover,

2    Vicodin and Tylenol #3 contain the same amount of Tylenol; thus, if an individual does not have

3    an allergic reaction to the Tylenol in Vicodin, he will not have an allergic reaction to the Tylenol

4    in Tylenol #3.  *Id.* at 14-15.[10]

5          Thus, although plaintiff and Ma dispute the extent of Ma's examination and treatment of

6    plaintiff, and whether plaintiff is allergic to Tylenol #3 and Penicillin, these disputes are not

7    material.  There is no evidence to show that Ma was aware of any allergies to either medication

8    yet prescribed it anyway.  Thus, a fair-minded jury could not return a verdict against Ma on the

9    evidence presented.  *Anderson*, 477 U.S. at 248, 252.

10         Further, plaintiff's claim that Ma did not treat him at the OHU is refuted by plaintiff's

11   own verified complaint (SAC at 5-6) which asserts that Ma was the doctor who ordered the

12   Tylenol #3 that he received the night of the extraction.  Plaintiff cannot create a genuine factual

13   dispute by contradicting the verified allegations of his own complaint.  *See also Jones v.*

14   *Marshall*, 459 F. Supp. 2d 1002, 1013 (E.D. Cal. 2006) (granting defendant summary judgment

15   on a deliberate indifference claim based on defendant's failure to touch or treat plaintiff because

16   there was no evidence that defendant's conduct caused further injury).  Moreover, plaintiff does

17   not dispute the claim that Ma ordered that plaintiff be seen on the dental line the following

18   morning and, shortly after arriving at the OHU, ordered the nursing staff to monitor plaintiff's

19   vital signs.  Such attentive care is inconsistent with plaintiff's claim that Ma was deliberately

20   indifferent to his serious medical needs.  *See Toguchi*, 391 F.3d at 1060 ("Deliberate indifference

21   is a high legal standard."); *Hutchinson*, 838 F.2d at 394.

22         The undisputed evidence indicates that Ma ordered that plaintiff be seen by a dentist the

23   following morning, ordered that plaintiff be admitted to and observed in the OHU, and prescribed

24   the Tylenol #3 that plaintiff received that night.  Of the greatest significance is Ma's statement—

25   which plaintiff cannot dispute—that he did not believe plaintiff was allergic to Tylenol.  *See Ma*

26   _____

27   [10]  It is unclear whether plaintiff claims an allergy to Vicodin.  *See* Pl.'s Decl. at ¶ 27 ("Being that I never taken Vicodin before August 3, 2010 I never had an allergic reaction to it nor would I have knowledge that it contains Tylenol.  I was never made aware by any physician that

28   Vicodin contains Tylenol.").

1    Decl. at ¶ 14 ("In my review of [plaintiff's] medical chart, both in 2010 and now as his primary

2    care physician, I have seen no indication of any genuine allergic reaction by [plaintiff] to any

3    medication.").  Under *Toguchi*, Ma's decision to prescribe Tylenol #3 cannot constitute deliberate

4    indifference if Ma did not believe that the medication presented a serious risk of harm to plaintiff.

5    *See Toguchi*, 391 F.3d at 1058 ("Because she did not believe that Cogentin use presented a

6    serious risk of harm to [plaintiff], her conduct cannot constitute deliberate indifference."); *see*

7    *also Murillo v. Thornton*, No. 07-CV-0197 W(POR), 2008 WL 110899, at *4 (S.D. Cal. Jan. 9,

8    2008) (prisoner's allegations that defendant "prescribed him the wrong medication and did not

9    inform him about the side effects," causing plaintiff "severe stomach aches and headaches for

10   four months," failed to state an Eighth Amendment claim).

11        Even believing plaintiff's version of the disputed facts, he has not produced evidence

12   sufficient to establish that Ma was deliberately indifferent to his serious medical needs.

13   Accordingly, Ma's motion for summary judgment must be granted.

14                              **c.  McGee**

15        McGee, too, seeks summary judgment on the ground that there is "no evidence that she

16   was deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 23.  McGee's

17   declaration does not dispute that she met with plaintiff on August 3, that plaintiff had a

18   temperature of 102.2 degrees, or that she contacted the on-call dentist.  McGee Decl. at ¶¶ 3, 4.

19   According to McGee, she measured plaintiff's vital signs in the Triage and Treatment Area after

20   learning that Antipov had extracted plaintiff's wisdom teeth earlier in the day.  *Id.*  Because

21   plaintiff was talking freely, McGee determined that there was no obstruction in plaintiff's airway.

22   *Id.* at ¶ 4.  But McGee was concerned that plaintiff could be bleeding into his airway, so she had

23   plaintiff open his mouth while she inspected the gauze that had been put in place after the

24   extraction.  *Id.* at ¶ 5.  Because the wisdom teeth are located at the very back of the mouth,

25   inspecting the gauze and ensuring that they were tightly packed into place required McGee to

26   insert her fingers far into plaintiff's mouth and to press on the gauze.  *Id.* at ¶ 6.  McGee contends

27   that she performed this task "with as much care and as gently as possible."  *Id.*  McGee then

28   contacted Burns, and he instructed only that ice packs be applied bilaterally.  *Id.* at ¶ 8.

1  According to McGee, plaintiff did not voice any complaints of pain or make any requests for pain

2  medication or antibiotics during the meeting.  *Id.* at ¶ 9.

3        As noted above, plaintiff contends that McGee was disrespectful towards plaintiff, did not

4  offer any medical assistance, and caused plaintiff great pain when she jammed her fingers down

5  plaintiff's throat in search of gauzes that he might have swallowed.  SAC at 5.  Thus, while

6  plaintiff and McGee dispute (1) whether McGee was disrespectful towards plaintiff, (2) whether

7  McGee offered medical assistance, and (3) why McGee put her fingers in plaintiff's mouth and

8  the degree of care she exercised when doing so, those disputes are not material under the

9  substantive law applicable to plaintiff's Eighth Amendment claims.

10       First, the disrespectful behavior alone that is described in plaintiff's amended complaint—

11 "insisting that I was on some illegal drugs" and "continuely [sic] interrogat[ing] me with

12 erroneous questions"—does not amount to deliberate indifference.  *See Oltarzewski v. Ruggiero*,

13 830 F.2d 136, 139 (9th Cir. 1987) ("[v]erbal harassment or abuse . . .  is not sufficient to state a

14 constitutional deprivation under 42 U.S.C. § 1983.") (quoting *Collins v. Cundy*, 603 F.2d 825,

15 827 (10th Cir. 1979)).

16       Second, while failing to render medical assistance can amount to deliberate indifference,

17 the undisputed evidence here indicates that McGee did in fact provide medical assistance.

18 Plaintiff's own complaint (SAC at 5) indicates that McGee contacted the on-call doctor and

19 searched plaintiff's throat for gauzes that he might have become lodged by swallowing during a

20 seizure.  Plaintiff also does not dispute McGee's claims that she checked plaintiff's vital signs

21 and took his temperature, that the only direction Burns provided McGee was to apply ice packs,

22 or that he received ice packs.  Thus, plaintiff has not shown that McGee was indifferent to

23 plaintiff's serious medical needs for failure to provide medical assistance.  *See Jones v. Marshall*,

24 459 F. Supp. 2d. at 1013.

25       Third, while the parties dispute the manner in which McGee placed her hands in plaintiff's

26 mouth and her specific purpose for doing so (plaintiff characterizes it as "jamm[ing] her fingers

27 down [his] throat") plaintiff has not established that McGee was deliberately indifferent to his

28 serious medical needs when doing so.  Of particular significance is plaintiff's own evidence

1    indicating that McGee was searching for gauzes that plaintiff may have partially swallowed

2    during his seizure.  At most, plaintiff own allegations amount to lack of reasonable care for

3    plaintiff's discomfort while McGee examined the mouth and throat for gauze that might have

4    been lodged in those areas.  The Supreme Court has made clear that deliberate indifference

5    "requires more than ordinary lack of due care." *Farmer*, 511 U.S. at 835 (quoting *Whitley v.*

6    *Albers*, 475 U.S. 312, 319, (1986)) (internal quotation mark omitted).  Not only does McGee's

7    purpose for the procedure conflict with plaintiff's claim that she was deliberately indifferent, but

8    plaintiff has not produced any evidence that McGee disregard a substantial risk of serious harm.

9    Again, deliberate indifference is a high legal standard requiring more than a showing of medical

10   malpractice or negligence.  *Toguchi*, 391 F.3d at 1060.

11       Taking plaintiff's version of the disputed facts regarding McGee as true, he has not

12   produced evidence sufficient to establish that McGee was deliberately indifferent to plaintiff's

13   serious medical needs.  Therefore, McGee's motion for summary judgment must be granted.

14                                   **d.  Maciel**

15       Maciel seeks summary judgment on the ground that there is "no evidence that he was

16   deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 24.  In his declaration,

17   he describes examining plaintiff on five occasions between August 10 and October 21, 2010.

18   Maciel Decl. at ¶¶ 3, 8, 11, 13, 15.[11]  Maciel states that he prescribed Tylenol, 325 mg after

19   examining plaintiff on August 10.  *Id.* at ¶¶ 3, 5.  During that examination, plaintiff told Maciel

20   that he was allergic to Motrin; Maciel then reviewed plaintiff's dental health history record and

21   confirmed that Motrin was listed as a drug allergy.  *Id.* at ¶ 5.  However, at that time Tylenol and

22   Penicillin were not so listed; according to Maciel's declaration, allergies to Tylenol and Penicillin

23   were added when the form was updated on August 20, 2010.[12]  *Id.*

---

24       [11]  Plaintiff's only complaint with respect to Maciel, however, appears to be that Maciel
25   prescribed the bag of Tylenol that plaintiff received on August 10.  SAC at 7.

26       [12]  As discussed below, defendant Downie states that at an August 20 meeting he asked
27   plaintiff to review and update the dental health history record plaintiff had completed on August
     3.  According to Downie, plaintiff had previously identified only Motrin as an allergy drug but he
28   added Tylenol and Penicillin at the August 20 meeting.

1    Maciel claims that plaintiff did complain of "slight pain" from the extraction and that the

2    Tylenol #3 was causing an upset stomach; however, plaintiff did not claim to be allergic to

3    Tylenol during Maciel's examination.  *Id.* at ¶¶ 3, 5.  Rather, plaintiff claimed only that Tylenol

4    #3 made him sick to his stomach.  *Id.*  at ¶ 5.  Maciel explains that stomach irritation is a "fairly

5    common side-effect" of Tylenol #3 and is not an indication of an allergy to the medication.  *Id.* at

6    ¶ 4.  Maciel also claims that "[n]o allergic symptoms were present in Thomas during my

7    examination of him . . . ."  *Id.*  Maciel prescribed the less powerful pain medication, Tylenol, 325

8    mg, rather than Tylenol #3 because he believed it would still relieve the pain but be less likely to

9    cause plaintiff stomach irritation.  *Id.* at ¶ 5.

10    In response to Maciel's motion, plaintiff contends that his Unit Health Record has listed

11    his allergies to Tylenol, Penicillin, Aspirin, and Motrin since he arrived in prison.  Pl.'s Decl. at

12    ¶ 30.[13]  He also contends that he told both Maciel and Downie at the August 10 appointment that

13    he was allergic to the Tylenol #3 that he had been prescribed for the preceding week, and that he

14    showed them "the rashes and hives that were all over [his] neck, arms, chest, stomach and back

15    . . . ."  *Id.* at ¶¶ 38, 40.

16    Even if plaintiff had produced the Unit Health Record listing his allergy to Tylenol on

17    August 10, and even if he showed Maciel the rashes and hives that he believes were caused by his

18    consumption of Tylenol #3, the undisputed evidence indicates that Maciel did not believe that the

19    Tylenol presented a serious risk of harm to plaintiff.  *See* Maciel Decl. at ¶¶ 4, 5 (stating that he

20    did not observe any allergic symptoms and "believed that the less powerful pain medication—

21    Tylenol rather than Tylenol #3—would still relieve the pain but would also be less-likely to cause

22    [plaintiff] the stomach irritation which he complained about").  As with plaintiff's claim against

23    Ma, this fact is critical under *Toguchi*.  Moreover, this is not an instance in which Maciel "knew

24    of a substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842.

25    When plaintiff informed Maciel of his allergy to Motrin, Maciel "consulted [plaintiff's] dental

26    health history record and confirmed it was listed as a drug allergy."  Maciel Decl. at ¶ 5.  The

27

28    [13]  Again, plaintiff has not submitted this Unit Health Record to the court.

1   dental health history record did not at that time list Tylenol or Penicillin as a drug allergy.  *Id.*

2   Because Maciel did not believe that prescribing plaintiff Tylenol would present a serious risk of

3   harm to plaintiff—a belief based on his examination of plaintiff and review of plaintiff's dental

4   health history record—Maciel's conduct cannot amount to deliberate indifference.  *See Toguci*,

5   391 F.3d at 1058.

6        Even believing plaintiff's version of the disputed facts, he has not produced evidence

7   sufficient to establish that Maciel was deliberately indifferent to his serious medical needs.

8   Therefore, Maciel is entitled to summary judgment.

9                              **e. Downie**

10       Downie also seeks summary judgment on the ground that there is "no evidence that he

11  was deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 25.  Downie, a

12  dentist, states in his declaration that he recalls seeing plaintiff on August 20, but not on August

13  10.  Downie Decl. at ¶¶ 4, 5.  Downie contends that at the August 20 meeting he asked plaintiff to

14  review and update a dental health history record that plaintiff completed on August 3.  *Id.* at ¶ 5.

15  Although plaintiff had previously identified an allergy only to Motrin, plaintiff added Tylenol and

16  Penicillin before signing the form on August 20.  *Id.* at ¶¶ 5, 6.[14]  Plaintiff complained of pain at

17  the appointment, and Downie considered prescribing Aspirin until plaintiff claimed that he was

18  also allergic to that medication.  *Id.* at ¶ 8.  Downie doubted the legitimacy of this claim:  not only

19  had plaintiff not claimed an allergy to Aspirin on his dental health history record—which plaintiff

20  had just updated at the beginning of the appointment—but plaintiff described his allergic

21  symptom to Aspirin as stomach discomfort.  *Id.*  According to Downie, stomach discomfort is not

22  an indication of a drug allergy.  *Id.*  Downie did not observe any allergic symptoms during his

23  examination of plaintiff.  *Id.* at ¶ 9.  Notwithstanding his skepticism, Downie reviewed plaintiff's

24  medical chart and contacted plaintiff's primary care physician to determine whether plaintiff's

25  alleged allergies were genuine.  *Id.* at ¶¶ 9, 10.  Downie eventually decided to prescribe Salsalate,

26  which is "commonly prescribed to patients who cannot take Aspirin," and plaintiff did not claim

27

28       [14]  Downie reviewed and signed that form, which is attached to his declaration as an
         exhibit.  Downie Decl. ("Exhibit A").

1    an allergy to it.  *Id.* at ¶ 11.  According to Downie, Salsalate and Aspirin are not the same

2    medication, and Salsalate does not contain Aspirin.  *Id.*

3          Thus, in comparing their respective version of the August appointments, plaintiff and

4    Downie dispute whether Downie was present at the August 10 appointment, whether Salsalate is

5    an alternative for someone who is allergic to Aspirin, and whether Salsalate contains Aspirin.

6    For purposes of this motion, the court must take as true plaintiff's claim that Downie was present

7    on August 10 and observed rashes and hives on plaintiff's body.  However, even assuming those

8    facts, the only evidence of plaintiff's purported allergic reaction to Tylenol and Penicillin is his

9    own lay testimony.  *See Hardy v. 3 Unknown Agents*, 690 F. Supp. 2d 1074, 1086 (C.D. Cal.

10   2010) (sustaining an objection to plaintiff's statement as improper lay testimony "to the extent

11   that plaintiff asserts that the allergic reaction was caused by the [medication]").  There is nothing

12   in the medical records before the court to establish a diagnosis or medical finding that plaintiff in

13   fact has or had an allergy to either medication.  But of greater significance to Downie's motion

14   for summary judgment is plaintiff's failure to allege any wrongdoing on Downie's part arising

15   from the August 10 appointment.  Plaintiff claims the bag of Tylenol that he received that evening

16   was prescribed by Maciel, not Downie.  Pl.'s Decl. at ¶ 42; *see also Leer*, 844 F.2d at 634 ("The

17   prisoner must set forth specific facts as to each individual defendant's deliberate indifference.").

18   Furthermore, similar to plaintiff's claims against Ma and Maciel, his deliberate indifference claim

19   against Downie fails because Downie did not believe that Salsalate presented a serious risk to

20   plaintiff's health.  *See Toguchi*, 391 F.3d at 1058.  Even if, as plaintiff claims, Salsalate contains

21   Aspirin and is not an alternative for someone who is allergic to Aspirin, a point for which plaintiff

22   has no expertise, Downie makes clear that he did not believe plaintiff's alleged allergy to Aspirin

23   was legitimate and provides cogent reasons why he did not believe plaintiff.  *See* Downie Decl. at

24   ¶ 8.  Accordingly, the undersigned recommends that Downie's motion for summary judgment as

25   to the allegations regarding the August 10 appointment and Downie's prescribing of Salsalate on

26   August 20 be granted.

27          However, in neither his declaration nor his motion for summary judgment did Downie

28   address or even acknowledge plaintiff's allegations regarding the request for a liquid diet on

23

1    August 20.  Because Downie has not properly addressed plaintiff's allegations as to this claim, it

2    cannot be disposed of on this motion.  Plaintiff has asserted that during the August 20

3    appointment, he informed Downie that he had not eaten anything since the extraction and

4    requested that Downie place him on a liquid diet.  Specifically, he alleges that Downie observed

5    plaintiff's swollen face and weight loss (ECF No. 45 at 7 -8; ECF No. 122 at 9-10), was made

6    aware that plaintiff was unable to chew or swallow food (ECF No. 122 at 10; ECF No. 45 at 8,

7    ¶ 20) and observed that plaintiff's mouth was too painful for plaintiff to open (ECF No. 122 at 93,

8    ¶ 103).  Plaintiff asserts that he specifically told Downie that he had not eaten anything since the

9    oral surgery and requested that Downie place him on a liquid diet at least until the swelling went

10   down.  ECF No. 45 at 8, ¶ 20.  Downie allegedly replied that it was not his department, but rather

11   "medical" that determines diet.  *Id.* at 9.  However, according to plaintiff, "medical" told plaintiff

12   that the dental department is responsible for that determination.  *Id.*  In any event, it was not until

13   August 26 that Maciel ordered a liquid diet for plaintiff.  *Id.* at 11.

14       Downie has shown no basis for granting summary judgment on this claim.  A fair-minded

15   jury could—on the undisputed evidence that Downie did not prescribe a liquid diet for plaintiff

16   despite knowing that plaintiff, due to a painful infection and post-operative condition had not

17   eaten anything in the seventeen days preceding the request—return a verdict for plaintiff on his

18   deliberate indifference claim against Downie.  *See Anderson*, 477 U.S. at 248, 252; *see also*

19   *Foster v. Runnels*, 554 F.3d 807, 815 n.5 (9th Cir. 2009) ("This conclusion, that the deliberate and

20   unnecessary withholding of food essential to maintain normal health can violate the Eighth

21   Amendment, is well supported by case law.").

22       Thus, it is recommended that Downie's motion for summary be granted as to plaintiff's

23   allegations regarding the August 10 appointment and Downie's prescription of Salsalate on

24   August 20, but denied as to plaintiff's allegations regarding his request to be placed on a liquid

25   diet on August 20.

26                    **f.  Park**

27       Park, too, seeks summary judgment on the ground that there is "no evidence that he was

28   deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 26.  Park states in his

24

1   declaration that he was the on-call dentist on August 24 and 25.  Park Decl. at ¶¶ 3, 7.  In the

2   evening on both of those days, Park received a telephone call informing him that plaintiff was

3   experiencing pain three weeks after having his wisdom teeth extracted and that plaintiff was

4   claiming an allergy to Tylenol, even though plaintiff's medication administration record listed an

5   allergy only to Motrin.  *Id.*  On August 24, Park ordered a one-time dosage of Morphine, that

6   plaintiff apply ice to the right side of his face, and that plaintiff be scheduled for an appointment

7   in the dental clinic the following day.  *Id.* at ¶ 4.  Park did not order an antibiotic at that time

8   because he expected plaintiff to be seen at the dental clinic the following day.  *Id.*  On August 25,

9   Park learned that plaintiff was unable to attend the dentist appointment because he had conflicting

10  medical appointments.  *Id.* at ¶ 8.  Park therefore ordered another dosage of Morphine and the

11  antibiotic Erythromycin.  *Id.* at ¶¶ 9-10.  Park ordered the Erythromycin because plaintiff claimed

12  to be allergic to Penicillin.  *Id.* at ¶ 10.  Park does not dispute that the August 25 physician's order

13  includes an order for Tylenol #3, but he does not recall ordering that medication and suspects it

14  was included by mistake.  *Id.* at ¶ 13.

15      Plaintiff does not dispute any part of Park's account (including Park's claim that the order

16  for Tylenol #3 was included by mistake), and plaintiff's deliberate indifference claim against Park

17  appears to be based solely on the prescription for Tylenol #3.  *See* SAC at 11; Pl.'s Decl. at ¶ 57.

18  The issue, then, is whether Park's mistake amounts to deliberate indifference.

19      "[D]eliberate indifference entails something more than mere negligence," *Farmer*, 511

20  U.S. at 835, and mistakes by medical professionals are not sufficient to meet the high legal

21  standard, *see Jones v. Sahota*, 570 F. App'x 638, 638 (9th Cir. 2014) (citing *Toguchi*, 391 F.3d at

22  1057-58, 1060); *Ross v. McGuinness*, 471 F. App'x 608, 609 (9th Cir. 2012).  Moreover, even if

23  the Tylenol #3 prescription was not a mistake, Park—similar to Ma, Maciel, and Downie—

24  believes "there is no evidence of [plaintiff] suffering [ ] a genuine allergic reaction at any time."

25  Park Decl. at ¶ 13.  Thus, because he did not believe that the Tylenol #3 that he prescribed

26  presented a serious risk of harm to plaintiff, Park's conduct cannot amount to deliberate

27  indifference.  *Toguchi*, 391 F.3d at 1058.  Furthermore, Park's mistake was of no consequence, as

28  plaintiff has not even alleged that he consumed the Tylenol #3 that Park prescribed.

1    Park was not deliberately indifferent for mistakenly prescribing Tylenol #3—a mistake

2    without any consequences.  Therefore, Park is entitled to summary judgment.

3                                  **g. <u>Grinde</u>**

4        As with the other defendants, Grinde seeks summary judgment on the ground that there is

5    "no evidence that he was deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2

6    at 26.  Grinde, the nurse who approved plaintiff's return to B-facility, describes speaking with

7    plaintiff on the evening of August 25.  Grinde Decl. at ¶ 5.  Upon learning of plaintiff's pain and

8    the fact that plaintiff had missed his dental appointment that day, Grinde contacted Park, the on-

9    call dentist.  *Id.* at ¶¶ 4-5.  Grinde informed Park that plaintiff was experiencing pain but was

10   unable to see a dentist that day due to conflicting medical appointments.  *Id.* at ¶ 5.  Grinde also

11   informed Park that although plaintiff was claiming to be allergic to Motrin and Tylenol, plaintiff's

12   medication administration record indicated only the allergy to Motrin.  *Id.* at ¶ 6.  According to

13   Grinde, Park ordered a single dosage of Morphine, Tylenol #3, an antibiotic, and that plaintiff be

14   seen in the dental clinic the following day.  *Id.* at ¶ 7.  Park initially ordered Penicillin, but instead

15   prescribed Erythromycin after learning that plaintiff claimed to be allergic to Penicillin.  *Id.*

16   Grinde prepared the "physician's orders" document that Park signed later.  *Id.* at ¶ 8.

17       Plaintiff's deliberate indifference claim against Grinde is based on (1) Grinde's approving

18   of plaintiff to return to B-facility after plaintiff's heart murmur appointment without any

19   treatment for his swollen face and extreme pain, (2) Grinde's statement that he could not do

20   anything for plaintiff because plaintiff was just trying to get drugs, and (3) the August 25

21   prescription for Tylenol #3.  Even believing plaintiff's evidence, plaintiff has not established that

22   Grinde was deliberately indifferent to his serious medical needs.

23       First, plaintiff does not dispute that Grinde contacted and informed Park of plaintiff's pain

24   and drug allergies before preparing the "physician's orders," nor does plaintiff contend that he did

25   not receive the prescribed medication.  Second, accusing plaintiff of feigning pain to get drugs

26   does not amount to deliberate indifference to plaintiff's serious medical needs.  *Oltarzewski*, 830

27   F.2d at 139.  Third, as noted above, the mistaken Tylenol #3 prescription of August 25 was of no

28   consequence, as plaintiff has not even alleged that he consumed that mistakenly prescribed

1    medication.  Thus, even believing plaintiff's version of the disputed facts, he has not produced

2    evidence sufficient to establish that Grinde was deliberately indifferent to his serious medical

3    needs.  Therefore Grinde is entitled to summary judgment.

4              **3.  Qualified Immunity**

5              Antipov and Downie contend that they are entitled to qualified immunity.  ECF No. 112-2

6    at 28.[15]

7              Qualified immunity protects government officials from liability for civil damages where a

8    reasonable person would not have known that their conduct violated a clearly established right.

9    *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).  "In resolving questions of qualified

10   immunity at summary judgment, courts engage in a two-pronged inquiry."  *Tolan v. Cotton*, ___

11   U.S. ___, ___, 134 S. Ct. 1861, 1865 (2014) (per curiam).  "The first asks whether the facts,

12   'taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct

13   violated a federal right.'"  *Id.* (internal bracketing omitted) (quoting *Saucier v. Katz*, 533 U.S.

14   194, 201 (2001)).  "The second prong of the qualified-immunity analysis asks whether the right in

15   question was 'clearly established' at the time of the violation."  *Tolan*, 134 S. Ct. at 1866 (quoting

16   *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  A plaintiff invokes a "clearly established" right when

17   "the contours of the right [are] sufficiently clear that a reasonable official would understand that

18   what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. at 640.  "The salient

19   question is whether the state of the law at the time of an incident provided fair warning to the

20   defendants that their alleged conduct was unconstitutional."  *Tolan*, 134 S. Ct. at 1866 (internal

21   bracketing and quotation marks omitted).

22             Antipov's assertion of qualified immunity is based on his contention that the care he

23   provided plaintiff was reasonable and therefore did not violate a plaintiff's Eighth Amendment

24   rights.  As explained above, there are triable issues of material fact with respect to whether

25   Antipov acted with deliberate indifference to plaintiff's serious medical needs in violation of the

26

27              [15]  Because it is recommended that summary judgment be granted as to the Eighth
     Amendment claims against Grinde, Ma, Maciel, McGee, and Park, a discussion of qualified
28   immunity as to those defendants is unnecessary.

1    Eighth Amendment.  Those same issues preclude summary judgment on Antipov's assertion of

2    qualified immunity.  Moreover, at the time of the alleged constitutional violations in this case,

3    "the general law regarding the medical treatment of prisoners was clearly established," and "it

4    was also clearly established that [prison staff] could not intentionally deny or delay access to

5    medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Hamilton v. Endell*,

6    981 F.2d 1062, 1066 (9th Cir. 1992) and *Estelle*, 429 U.S. at 104-05)).

7          Downie's assertion of qualified immunity is also unconvincing.  As explained above,

8    Downie does not dispute the fact that he denied plaintiff's request for a liquid diet, even after

9    learning that plaintiff had not eaten anything in the seventeen days before the August 20

10   appointment.  Not only does such undisputed evidence show a violation of a constitutional right,

11   but that right was clearly established when Downie violated that right.  *See Foster*, 554 F.3d at

12   815 ("There is no question that an inmate's Eighth Amendment right to adequate food is clearly

13   established.").

14         Neither Antipov nor Downie are entitled to qualified immunity.

15         **B.      Plaintiff's Counter-Motion for Summary Judgment**

16         Plaintiff filed an opposition to defendants' motion for summary judgment and a counter-

17   for summary judgment.  ECF No. 122.  In their reply, defendants argue that the court should deny

18   plaintiff's counter-motion as untimely and construe it only as an opposition to defendants'

19   motion.  ECF No. 125 at 12.  Although defendants correctly point out that the deadline for filing

20   dispositive motions was March 24, 2014, *see* ECF No. 101, and that plaintiff did not file his

21   counter-motion for summary judgment until July 31, 2014,[16] *see* ECF No. 122, plaintiff's motion

22   is considered on its merits and is denied.  Plaintiff's motion is denied not because it is untimely,

23   but because it is a counter-motion for summary judgment in name only.

24   /////

25   

---

26         [16] Defendants emphasize that while the court granted plaintiff an extension of time to file
     his opposition, *see* ECF Nos. 114, 120, the court did not grant plaintiff an extension to file a
27   dispositive counter-motion for summary judgment.  *But see* E.D. Cal. L.R. 230(e) (explaining that
     counter-motions "shall be served and filed in the manner and on the date prescribed for the filing
28   of opposition").

1    Only in conclusory statements at the beginning and end of plaintiff's counter-motion does

2    plaintiff argue that the court should grant summary judgment in his favor.  *See* ECF No. 122 at 5,

3    27.  He makes no claim that there is an absence of a genuine issue of material fact as to the facts

4    which would entitle him to judgment in his favor, *see Celotex*, 477 U.S. at 323, and seems to

5    misunderstand the standard for summary judgment, *see* ECF No. 122 at 9 (arguing that "[t]he

6    issue for the court is whether plaintiff has *sufficiently alleged* that individual defendants were

7    deliberately indifferent to his medical needs.") (emphasis added).  First, plaintiff is not simply

8    opposing a Rule 12(b)(6) motion to dismiss for failure to state a claim.  Federal Rule of Civil

9    Procedure 56 and *Celotex* require more than sufficient allegations.  Secondly, as to his counter-

10   motion for summary judgment plaintiff overlooks the point that it is he, not the defendants, who

11   bear the ultimate burden of proof as to each of the elements of his claims.  For the same reasons

12   discussed above in the context of defendants' motions, plaintiff has produced no evidence

13   indicating that he can meet that burden.  Because plaintiff has not met his burden of providing a

14   properly supported motion for summary judgment, his "counter motion" for summary judgment

15   must be denied.[17]

16   **IV.   RECOMMENDATION**

17        For the reasons stated above, it is hereby RECOMMENDED that (1) defendants' motion

18   for summary judgment (ECF No. 112) be granted as to defendants Grinde, Ma, Maciel, McGee,

19   and Park, but denied as to defendants Antipov and Downie, (2) plaintiff's counter-motion for

20   summary judgment (ECF No. 122) be denied as to all defendants, and (3) plaintiff's request for

21   judicial notice (ECF No. 123) be denied.[18]

22        These findings and recommendations are submitted to the United States District Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

24   after being served with these findings and recommendations, any party may file written

25   _____
     [17]  This resolution moots defendants' request for the opportunity to respond to the merits
26   of plaintiff's counter-motion.  *See* ECF No. 125 at 12.

27        [18]  If the court adopts this recommendation, the action will proceed solely as to plaintiff's
     Eighth Amendment claims against defendants Antipov and Downie.  As to Downie, plaintiff's
28   claim is limited to the allegations regarding his request to be placed on a liquid diet on August 20.

29

1  objections with the court and serve a copy on all parties.  Such a document should be captioned

2  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

3  within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

4  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

5  DATED:  December 18, 2014.

7  EDMUND F. BRENNAN
   UNITED STATES MAGISTRATE JUDGE