1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMAAL THOMAS,                              No.  2:11-cv-1138-MCE-EFB P

12                 Plaintiff,

13        v.                                     ORDER AND AMENDED FINDINGS AND
                                                 RECOMMENDATIONS
14   ANTIPOV, et al.,

15                 Defendants.

16

17        Plaintiff is a state prisoner proceeding without counsel in an action brought under 42

18   U.S.C. § 1983.  He alleges Eighth Amendment claims of deliberate indifference to serious

19   medical needs against each remaining defendant.  ECF No. 45.  Defendants have filed a motion

20   for summary judgment, ECF No. 112-2, and plaintiff filed a counter-motion for summary

21   judgment.  ECF No. 122.  Proposed findings and recommendations were issued on December 19,

22   2014, recommending that summary judgment be granted as to defendants Grinde, Ma, Maciel,

23   McGee, and Park, but denied as to defendants Antipov and Downie, and further recommending

24   that plaintiff's counter-motion for summary judgment be denied as to all defendants.  Defendants

25   timely filed objections, arguing that the court should grant their motion for summary judgment as

26   to defendant Downie.  ECF No. 127.  In light of defendants' objections, the December 19, 2014

27   findings and recommendations are vacated and the issues raised are addressed in the following

28   amended findings and recommendations.  Specifically, the recommendation is amended to

                                                 1

1    include the recommendation that defendant Downie be granted summary judgment on the

2    allegations regarding Downie's prescription of pain medication.  However, the recommendation

3    as to all other claims remains the same.

4        Therefore, for the reasons set forth below, notwithstanding defendants' Objections, it is

5    recommended that (1) defendants' motion for summary judgment be granted as to defendants

6    Grinde, Ma, Maciel, McGee, and Park, but granted in part and denied in part as to defendant

7    Downie and denied as to defendant Antipov, and (2) plaintiff's counter-motion for summary

8    judgment be denied as to all defendants.

9    **I.       BACKGROUND**

10       This action proceeds on plaintiff's verified second amended complaint filed May 7, 2012.

11   ECF No. 45 ("SAC") at 1, 16.[1]  Plaintiff alleges that defendants Antipov, Downie, Grinde, Ma,

12   Maciel, McGee, and Park were deliberately indifferent to his serious medical needs before,

13   during, and after the extraction of his wisdom teeth.  *Id.* at 1, 12.  Antipov is an oral surgeon who

14   performed the extractions while working for the California State Prison, Sacramento as an

15   independent contractor.  ECF No. 112-9 ("Antipov Decl.") at ¶ 1.  Downie, Park, and Maciel are

16   dentists.  SAC at 3.  Ma is a physician.  *Id.*  McGee and Grinde are registered nurses.  *Id.*

17       Defendant Antipov removed plaintiff's four wisdom teeth on August 3, 2010.  *Id.* at 4.

18   According to plaintiff, he informed Antipov before the extractions that he needed to be pre-

19   medicated with antibiotics before every dental procedure because of his heart murmur, but neither

20   the dental staff nor Antipov had plaintiff's medical files on hand to confirm plaintiff's contention.

21   *Id.*[2]  Before the extraction, plaintiff was given a Dental Health Record form to complete that

22   asked him to list all medication allergies.  Pl.'s Decl. at ¶ 10 (ECF No. 122 at 76).  Plaintiff

---

23       [1] For ease of reference, all citations to court documents are to the pagination assigned via

24   the court's electronic filing system.

25       [2] According to plaintiff, a doctor diagnosed him with a heart murmur on May 14, 2008.

26   ECF No. 122, 74-96 ("Pl.'s Decl.") at ¶ 4.  That doctor ordered plaintiff to take prescribed
     antibiotics thirty minutes before any dental surgery.  *Id.*  Other doctors made that same

27   recommendation on January 16, March 5, and March 17, 2009.  *Id.* at ¶ 6.  Additionally,
     defendant Downie added that recommendation to plaintiff's progress notes on December 22,

28   2009.  *Id.* at ¶¶ 7, 8.

1  signed this form before it was completed because the nurse assisting him "made it confusing." *Id.*

2  The nurse wrote "Motrin" before returning the form to plaintiff and spelling "Tylenol" and

3  "Penicillin" for him to add to the form. *Id.*  Plaintiff says it was difficult for him to understand

4  the nurse, who took the form back out of frustration, saying she would add Aspirin and Naproxen.

5  *Id.*  Nevertheless, though the form he signed on the day of the extraction listed only an allergy to

6  Motrin, plaintiff claims that his Unit Health Record "has [had] allergies to Tylenol, Penicillin,

7  Aspirin, [and] Motrin written on it since [his] arrival to prison." [3] *Id.* at ¶ 30 (ECF No. 122 at 81).

8       Antipov injected plaintiff with local anesthesia before the extraction. *Id.* at ¶ 11 (ECF No.

9  122 at 76).  Plaintiff claims that his heart began to beat rapidly and he experienced cold chills

10  moments later. *Id.*  Plaintiff describes the procedure as protracted and problematic.  He asserts

11  that Antipov showed no concern for plaintiff's well-being, as he left "mouth hinges"[4] in

12  plaintiff's mouth for the entire two-hour procedure and failed to prescribe necessary antibiotics

13  and pain medication.  SAC at 4.  Plaintiff claims that Antipov struggled to remove plaintiff's left

14  and lower right wisdom teeth, and he became "frustrated to [the] point that he applied immense

15  pressure, that [plaintiff's] whole head was being pulled to and fro." *Id.*  Plaintiff claims that

16  Antipov ignored plaintiff's complaints of pain, Pl.'s Decl. at ¶ 12 (ECF No. 122 at 76-77), and

17  that because the procedure took longer than expected, plaintiff was rushed out of the dental office

18  without receiving any pain medication, SAC at 4.   Plaintiff also asserts that Antipov later stated

19  that the surgery was difficult.  Pl.'s Decl. at ¶ 86 (ECF No. 122 at 91).

20       Later on the day of the extractions, plaintiff experienced extreme pain, difficulty

21  breathing, a rapid heartbeat, chest pain, and a fever.  *Id.*  Correctional officers took plaintiff to the

22  prison medical facility after he suffered a seizure.  SAC at 5.  There, he spoke with defendant

23  McGee, a nurse, who filled out and signed a form indicating that plaintiff's pain level was ten out

24  of ten.  Pl.'s Decl. at ¶ 71 (citing Ex. E to Pl.'s Opp'n).  McGee contacted the on-call doctor, but

25  allegedly was openly disrespectful towards plaintiff.  SAC at 5.  Plaintiff asserts that he had a

26  _____

[3]  Plaintiff has not submitted this Unit Health Record to the court.

27

28  [4]  In his declaration, plaintiff adopts Antipov's terminology and refers to them as "bite
blocks."  Pl.'s Decl. at ¶ 12.

1   temperature of 102.5 degrees, but McGee did not offer any medical assistance.  *Id.*  He further

2   claims that McGee "jammed her fingers down [plaintiff's] throat in search of" gauzes that

3   plaintiff might have swallowed during his seizure.  *Id.*  Though McGee could not locate any

4   gauzes, two correctional officers were able to.  *Id.*  According to plaintiff, McGee's actions

5   caused him great pain.  *Id.*  When the on-call doctor arrived, he observed plaintiff's state and

6   contacted Burns, a dentist.  *Id.* at 5-6.[5]  Upon learning that plaintiff had not received any pain

7   medication after the extraction, Burns provided liquid pain medication, prescribed liquid Vicodin,

8   scheduled plaintiff for an appointment with a prison dentist the following morning, and sent

9   plaintiff to the Outpatient Housing Unit ("OHU") to be monitored throughout the night.  *Id.* at 6.

10      At OHU, plaintiff met with defendant Ma, the on-call doctor.  *Id.*  But plaintiff claims that

11   instead of examining or treating plaintiff, Ma left him in the cell suffering.  *Id.*  When the pain

12   became unbearable, plaintiff banged on his door and requested the liquid Vicodin that Burns had

13   ordered.  *Id.*  An hour later, a nurse informed plaintiff that the OHU did not carry liquid Vicodin,

14   and tried to give plaintiff the Tylenol #3 that Ma had ordered.  *Id.*  Plaintiff told both Ma and the

15   nurse that he could not take Tylenol, Aspirin, Penicillin, Naproxen, Ibuprofen, or Motrin.  *Id.*

16   Plaintiff, without having seen a dentist in OHU, was sent back to his cell at approximately 2:00

17   p.m. the following day.  *Id.* at 7.

18      Plaintiff was not seen by a dentist until August 10.  *Id.*  Throughout the preceding week

19   plaintiff was taking medication that he assumed he was not allergic to, as he had informed Ma of

20   his medication allergies.  *Id.*  The Tylenol #3 and Penicillin were "crushed down into water" and

21   plaintiff "did not know that Liquid T-3 stood for Tylenol #3 . . . ."  Pl.'s Decl. at ¶¶ 34, 35 (ECF

22   No. 122 at 82).  But plaintiff was having an allergic reaction to the medication, experiencing chest

23   and heart pain, rashes, a swollen face, hives, diarrhea, bloody stool, continuous vomiting,

24   migraines, ear aches, fatigue, difficulty breathing, and dehydration.  SAC at 7.  The dentist

25   appointment on August 10 was not for these issues or even a follow-up for his surgery, but rather

26   a scheduled tooth cleaning.  *Id.*  Defendant Downie, a dentist, retrieved plaintiff's medical file

27

28      [5] Burns is not a defendant in this case.

4

1    upon observing plaintiff's swollen face.  *Id.*  Plaintiff informed Downie of the "severe pain [he]

2    was in, how [he] was unable to chew nor swallow any food since before the oral surgery, and all

3    the stomach pain [he] had due to this."  Pl.'s Decl. at ¶ 41 (ECF No. 122 at 83).  Downie

4    discontinued Ma's prescription and said that he would prescribe pain medication that plaintiff

5    could tolerate.  SAC at 7.  Downie also said that he would have plaintiff return in a week.  *Id.*

6         Later on the night of August 10, plaintiff received a bag of Tylenol that defendant Maciel

7    had prescribed.  *Id.*  Plaintiff returned the medication to the medical technician and informed her

8    of his "condition."  *Id.*  *But cf.* Pl.'s Decl. at ¶ 42 (ECF No. 122 at 83) (stating that he "took this

9    medication for a couple of days not knowing it was Tylenol.").  Plaintiff claims Maciel did not

10   check plaintiff's dental health history records to see what medications plaintiff was allergic to.

11   Pl.'s Decl. at ¶ 100 (ECF No. 122 at 93).

12        Plaintiff continued to experience extreme pain after August 10.  *Id.*  Every night, prison

13   staff would provide plaintiff with a bag of Tylenol, and plaintiff would inform them that he was

14   allergic to that medication.  SAC at 8.  Because plaintiff did not receive any other medication, he

15   was "forced to either take the medication that [he] was allergic to . . . or just suffer through it all,

16   in hopes of getting better . . . ."  *Id*.  On August 17, a nurse became very concerned for plaintiff's

17   health.  *Id.*  Upon learning of plaintiff's medication allergies, the nurse made a bold notation in

18   plaintiff's medical file.  *Id.*  The nurse also scheduled plaintiff for an appointment with the dentist

19   the following morning.  *Id.*

20        But plaintiff did not meet with a dentist until August 20.  *Id.*  Upon seeing plaintiff's

21   condition and weight loss on that date, Downie prescribed Salsalate for plaintiff's pain.  *Id.*

22   Downie did not prescribe anything for plaintiff's swollen face.  *Id.*  Downie did not examine

23   plaintiff's mouth because it was too painful for plaintiff to open his mouth.  Pl.'s Decl. at ¶ 103

24   (ECF No. 122 at 93).  After informing Downie that he had not eaten anything since the extraction,

25   plaintiff requested that Downie place him on a liquid diet.  SAC at 8.  Downie replied that it was

26   not his department, but rather medical, that determines diet.  *Id.* at 9.  Medical, however, told

27   plaintiff that the dental department is responsible for that determination.  *Id.*  Plaintiff was not

28   placed on a liquid diet.  *Id.*  Because of the pain, plaintiff eventually took the Salsalate that

1  Downie prescribed.  *Id.*  Plaintiff also had an allergic reaction to that medication.  *Id.*  Upon

2  learning that Salsalate has Aspirin in it, plaintiff requested another medication.  *Id.*

3  Plaintiff, "without receiving any pain medication," passed out on August 24.  *Id.*  He was

4  taken to the medical facility, where the nurse called defendant Park, a doctor.  Park prescribed

5  Morphine for the night and scheduled a dentist appointment for plaintiff.  *Id.*

6  On August 25, plaintiff had an appointment at San Joaquin General Hospital concerning

7  his heart murmur.  *Id.* at 10.  Because of that appointment, plaintiff was not able to attend the

8  dental appointment that Park had ordered.  *Id.*  Upon returning to the prison's A-facility to be

9  checked back into the institution, defendant Grinde, a nurse, approved plaintiff's return to B-

10  facility without any treatment.  *Id.*  Plaintiff's face was severely swollen, and he expressed to

11  Grinde that he was in severe pain.  *Id.*; Pl.'s Decl. at ¶ 104 (ECF No. 122 at 93).

12  At B-facility, plaintiff refused to go back into his cell until he received treatment for his

13  pain.  SAC at 9.  After plaintiff argued with medical staff for fifteen minutes, Grinde reported to

14  B-facility.  *Id.*  Grinde stated that he could not do anything for plaintiff because plaintiff was just

15  trying to get drugs.  *Id.*  When Grinde stated that he would provide Tylenol #3, plaintiff informed

16  Grinde that he was allergic to that and other medications.  *Id.*  Grinde called Park, who again

17  prescribed Morphine for the pain.  *Id.* at 11.  But Park also prescribed Tylenol #3 and Penicillin,

18  despite knowing of plaintiff's allergies to those medications.  *Id.*  After plaintiff argued with both

19  Grinde and Park, Park also prescribed Erythromycin for plaintiff's infection.  *Id.*

20  On August 26, plaintiff met with Maciel.  *Id.*  Maciel prescribed plaintiff liquid

21  Methadone, continued the Erythromycin treatment, ordered plaintiff a liquid diet, and scheduled

22  plaintiff for an appointment with the oral surgeon.  *Id.*  Maciel then prescribed a stronger

23  antibiotic and called plaintiff in everyday to receive an oral rinse to treat the infection.  *Id.* at 12.

24  Plaintiff is still "suffering from the effects of this whole ordeal," as his jaw unhinges when

25  he chews and hurts when he speaks.  SAC at 12.  Specifically, plaintiff claims that Antipov's

26  extraction caused "TMJ, a dislocated disk in [plaintiff's] jaw and a deviation" in plaintiff's jaw.

27  Pl.'s Decl. at ¶ 76 (ECF No. 122 at 89).  Additionally, his heart condition "worsened

28  tremendously" as a direct result of the extraction and the medical care he received afterwards,

1    SAC at 12, and he lost weight as a result of not being able to eat from August 3 until the first

2    week of September, Pl.'s Decl. at ¶ 13 (ECF No. 122 at 77).[6]

3    **II.      STANDARD**

4         Summary judgment is appropriate when there is "no genuine dispute as to any material

5    fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary

6    judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant

7    to the determination of the issues in the case, or in which there is insufficient evidence for a jury

8    to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600

9    (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v.*

10   *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment

11   motion asks whether the evidence presents a sufficient disagreement to require submission to a

12   jury.

13        The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims

14   or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to

15   "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

16   trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R.

17   Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary

18

19        [6] Plaintiff also makes several medical claims based on documents he has filed with the
     court. However, those documents do not support the claims that plaintiff derives from them. For

20   example, plaintiff contends that a heart murmur consultation on June 18, 2013, "showed that [he]
     was at risk of encocaditis[,] a heart disease that is caused from not being pre[-]medicated before

21   oral surgery and an infection from oral surgery getting into the bloodstream traveling to the
     heart." Pl.'s Decl. at ¶ 82 (citing "Exhibit W" to Pl.'s Opp'n). Additionally, plaintiff claims the

22   extraction caused TMJ, trismus, a displaced disk, and risk of osteomylitis, and that at an
     appointment on June 18, 2014, a doctor explained to plaintiff that his current heart condition was

23   "impacted from" Antipov's surgery. *Id.* at ¶ 83, 84 (citing "Exhibit X" to Pl.'s Opp'n).

24        However, the court has reviewed both Exhibits W and X and finds that neither "shows"
     nor even mentions the causation that plaintiff claims. Exhibit W consists of dental progress notes

25   from March 1 and May 16, 2011. The note dated March 1 indicates plaintiff's "jaw doesn't pop
     anymore" and "opens freely without pain." ECF No. 122 at 176. The note dated May 16 states:

26   "Having soreness on right side of jaw. Palpation on right TMJ—he states he has pain—open is
     limited[.] Bite is normal. No swelling or [illegible] present[.] He said pain has decrease[d.]" *Id.*

27   at 177. Exhibit X is a dental progress note from August 3, 2010 (i.e., the day of the extraction).
     *Id.* at 179.

28

7

1   judgment practice, the moving party bears the initial responsibility of presenting the basis for its

2   motion and identifying those portions of the record, together with affidavits, if any, that it

3   believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323;

4   *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  If the moving party meets

5   its burden with a properly supported motion, the burden then shifts to the opposing party to

6   present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*,

7   477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

8        A clear focus on where the burden of proof lies as to the factual issue in question is crucial

9   to summary judgment procedures.  Depending on which party bears that burden, the party seeking

10  summary judgment does not necessarily need to submit any evidence of its own.  When the

11  opposing party would have the burden of proof on a dispositive issue at trial, the moving party

12  need not produce evidence which negates the opponent's claim.  *See, e.g., Lujan v. National*

13  *Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  Rather, the moving party need only point to matters

14  which demonstrate the absence of a genuine material factual issue.  *See Celotex*, 477 U.S. at 323-

15  24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a

16  summary judgment motion may properly be made in reliance solely on the 'pleadings,

17  depositions, answers to interrogatories, and admissions on file.'").  Indeed, summary judgment

18  should be entered, after adequate time for discovery and upon motion, against a party who fails to

19  make a showing sufficient to establish the existence of an element essential to that party's case,

20  and on which that party will bear the burden of proof at trial.  *See id.* at 322.  In such a

21  circumstance, summary judgment must be granted, "so long as whatever is before the district

22  court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

23  satisfied." *Id.* at 323.

24       To defeat summary judgment the opposing party must establish a genuine dispute as to a

25  material issue of fact.  This entails two requirements.  First, the dispute must be over a fact(s) that

26  is material, i.e., one that makes a difference in the outcome of the case.  *Anderson*, 477 U.S. at

27  248 ("Only disputes over facts that might affect the outcome of the suit under the governing law

28  will properly preclude the entry of summary judgment.").  Whether a factual dispute is material is

1    determined by the substantive law applicable for the claim in question.  *Id.*  If the opposing party

2    is unable to produce evidence sufficient to establish a required element of its claim that party fails

3    in opposing summary judgment.  "[A] complete failure of proof concerning an essential element

4    of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S.

5    at 322.

6         Second, the dispute must be genuine.  In determining whether a factual dispute is genuine

7    the court must again focus on which party bears the burden of proof on the factual issue in

8    question.  Where the party opposing summary judgment would bear the burden of proof at trial on

9    the factual issue in dispute, that party must produce evidence sufficient to support its factual

10   claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.

11   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit

12   or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue

13   for trial.  *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076.  More significantly, to

14   demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such

15   that a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*,

16   477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

17        The court does not determine witness credibility.  It believes the opposing party's

18   evidence, and draws inferences most favorably for the opposing party.  *See id.* at 249, 255;

19   *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the

20   proponent must adduce evidence of a factual predicate from which to draw inferences.  *American*

21   *Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J.,

22   dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at

23   issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th

24   Cir. 1995).  On the other hand, the opposing party "must do more than simply show that there is

25   some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

26   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

27   trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant

28   summary judgment.

1    Concurrent with their motion for summary judgment, defendants advised plaintiff of the

2    requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.

3    ECF No. 112-1; *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d

4    952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999); *Klingele v. Eikenberry*,

5    849 F.2d 409 (9th Cir. 1988).[7]

6    **III.    ANALYSIS**

7         **A.    Defendants' Motion for Summary Judgment**

8    Defendants argue that they are entitled to summary judgment because (1) plaintiff's

9    opposition does not comply with Local Rule 260(b), (2) plaintiff has not produced any evidence

10   of any defendant's deliberate indifference, and (3) they are entitled to qualified immunity.

11        **1.    Local Rule 260(b)**

12   Defendants argue that summary judgment is appropriate because plaintiff's opposition to

13   their motion for summary judgment does not comply with Local Rule 260(b).  That rule states:

> Any party opposing a motion for summary judgment . . . shall
> reproduce the itemized facts in the Statement of Undisputed Facts
> and admit those facts that are undisputed and deny those that are
> disputed, including with each denial a citation to the particular
> portions of any pleading, affidavit, deposition, interrogatory
> answer, admission, or other document relied upon in support of
> that denial.

19   E.D. Cal. L.R. 260(b).  In his opposition, plaintiff repeats many of the allegations in his second

20   amended complaint, maintains his own account of the facts in this case, and includes his own

21   "Separate Statement of Disputed Facts."  ECF No. 122 at 51-62.  Plaintiff's filing satisfies the

22   core purpose for requiring an annotated statement of facts in that it sufficiently identifies the facts

23   that plaintiff disputes and, importantly, cites to the specific material in the record that plaintiff

24

25        [7]  Plaintiff requests that the court take judicial notice of Ninth Circuit cases that address
26   pro se litigants and the summary judgment standard.  ECF No. 123.  Supplemental authority is
     not an adjudicative fact subject to judicial notice under Federal Rule of Evidence 201.  A party
27   need not request judicial notice of published decisions, as simply citing such decisions in a brief
     is sufficient.  Accordingly, the plaintiff's request for judicial notice is denied as both moot and
28   unnecessary.  The court has considered the authority cited.

1    relies upon for the factual assertion.  The argument that this should all be moved to a separate

2    sheet of paper simply exalts form over substance.  Thus, defendants are not entitled to summary

3    judgment on the ground that plaintiff's opposition failed to comply with Local Rule 260(b).

4            **2.**        **Plaintiff's Eighth Amendment Claim**

5    Defendants also argue that they are entitled to summary judgment because plaintiff has

6    not produced any evidence of any defendant's deliberate indifference.

7    To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

8    plaintiff must establish that he had a serious medical need and that the defendant's response to

9    that need was deliberately indifferent.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see*

10    *also Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to

11    treat the condition could result in further significant injury or the unnecessary and wanton

12    infliction of pain.  *Jett*, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial,

13    delay, or intentional interference with medical treatment, or by the way in which medical care is

14    provided.  *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

15    To act with deliberate indifference, a prison official must both be aware of facts from

16    which the inference could be drawn that a substantial risk of serious harm exists, and he must also

17    draw the inference.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if

18    he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing

19    to take reasonable measures to abate it."  *Id.* at 847.  A physician need not fail to treat an inmate

20    altogether in order to violate that inmate's Eighth Amendment rights.  *Ortiz v. City of Imperial*,

21    884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition,

22    even if some treatment is prescribed, may constitute deliberate indifference in a particular case.

23    *Id.*

24    It is important to differentiate common law negligence claims of malpractice from claims

25    predicated on violations of the Eighth Amendment's prohibition of cruel and unusual punishment.

26    /////

27    /////

28    /////

11

1   In asserting the latter, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not

2   support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.

3   1980) (citing *Estelle*, 429 U.S. at 105-06); *see also Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th

4   Cir. 2004).

5                                  a. __Antipov__

6          Antipov seeks summary judgment on the ground that there is "no evidence that he was

7   deliberately indifferent to [plaintiff's] medical needs." ECF No. 112-2 at 22. Antipov's motion

8   is based on his declaration, in which he does not dispute that he removed plaintiff's four wisdom

9   teeth after providing local anesthesia but without premedicating plaintiff with antibiotics.

10  Antipov Decl. at ¶¶ 3, 5-7. Antipov also does not dispute that he did not prescribe plaintiff pain

11  medication or antibiotics after the extraction. *Id.* at ¶ 10. However, there is a dispute as to

12  whether he had the authority to do so. Antipov claims he did not prescribe plaintiff with either

13  pain medication or antibiotics after the extraction because, as an independent contractor not on

14  the medical staff at the prison, he is not permitted to prescribe medication to inmates; "Instead, it

15  is up to the medical staff at the prison, such as [plaintiff's] dentist, to prescribe such medications

16  following the wisdom tooth extraction." *Id.* at ¶ 10. Plaintiff claims that Antipov had the

17  authority but was deliberately indifferent in not prescribing medications necessary to address

18  plaintiff's serious medical needs. ECF No. 122 at 12.

19         Antipov's account differs from plaintiff's version of events in several other respects.

20  Antipov claims that he did in fact review plaintiff's medical chart before the extraction. *Id.* at ¶ 4.

21  His review indicated that plaintiff had in fact previously been hospitalized with heart murmurs

22  but was not under treatment on the day of the extraction. *Id.* He contends however, that

23  premedicating plaintiff with an antibiotic would have been "unnecessary and inappropriate," and

24  notes that the American Heart Association and American Dental Association have not

25  recommended such premedication for individuals with heart murmurs since 2007. *Id.* at ¶ 5.

26  Contrary to plaintiff's claim that Antipov struggled to remove some teeth, Antipov describes the

27  extraction of plaintiff's wisdom teeth as a "very routine" and "fairly easy" procedure. *Id.* at ¶ 8.

28  Antipov asserts that the entire procedure took approximately twenty minutes, and plaintiff never

1   indicated to Antipov that he was in any discomfort.  *Id.*  Antipov explains that he did not place

2   any "hinges" in plaintiff's mouth, but rather used "bite blocks," which make the procedure more

3   comfortable for the patient.  *Id.* at ¶ 9.  According to Antipov, infections, slow-healing gums, and

4   pain and swelling in the gums and tooth socket are common side effects of wisdom tooth

5   extraction.  *Id.*

6          Thus, plaintiff and Antipov dispute whether Antipov reviewed plaintiff's medical chart

7   before the extractions and whether Antipov should have premedicated plaintiff with antibiotics.

8   They also dispute the length and difficulty of the extraction, whether Antipov ignored plaintiff's

9   complaints of pain, and—significantly—whether Antipov's decision not to prescribe pain

10  medication and antibiotics despite knowing plaintiff's condition can constitute an Eighth

11  Amendment violation under these circumstances.  As noted, Antipov claims he did not have the

12  authority to prescribe plaintiff pain medication and antibiotics.

13         The dispute over Antipov's alleged failure to review plaintiff's medical chart before the

14  extraction appears to be of little consequence.  Plaintiff suggests that if Antipov had looked at the

15  medical chart he would have seen that other doctors had recommended that plaintiff premedicate

16  with antibiotics before any dental surgery.  Pl.'s Decl. at ¶¶ 4, 6-8 (ECF No. 122 at 75).  Plaintiff

17  has certainly established a difference of opinion between he and Antipov and also between

18  Antipov and other doctors.  But the recommendation of other doctors was not binding on

19  Antipov, who instead relied on guidelines from the American Heart Association and the

20  American Dental Association.  The Ninth Circuit has made clear that a difference of medical

21  opinion is, as a matter of law, insufficient to establish deliberate indifference.  *See Toguchi*, 391

22  F.3d at 1058.  "Rather, to prevail on a claim involving choices between alternative courses of

23  treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable

24  under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the

25  prisoner's] health.'"  *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

26  Plaintiff has not shown that Antipov's decision to not premedicate plaintiff with antibiotics was

27  medically unacceptable under the circumstances, nor that Antipov made that determination in

28  conscious disregard of an excessive risk to plaintiff's health; the American Heart Association and

1    American Dental Association guidelines that Antipov refers to suggest just the opposite.  Thus,

2    neither the claim that Antipov did not review plaintiff's medical chart nor the claim that Antipov

3    should have premedicated plaintiff with antibiotics establishes deliberate indifference.  Thus, the

4    dispute over review of the medical chart is not a dispute over a material issue of fact.

5           However, the disputes over the length and difficulty of the extractions, the level of

6    plaintiff's pain during and after the extractions, and what, if anything, Antipov did to address the

7    pain and potential for infection are material.  Plaintiff describes a prolonged and problematic

8    procedure during which Antipov became frustrated over the difficulty removing the left and right

9    lower wisdom teeth.  SAC at 4.  He describes Antipov having to apply "immense pressure, that

10   my whole head was being pulled to and fro."  *Id.*  He further adds that "[b]eing that my procedure

11   took longer than expected I was rush[ed] out of the dental office without receiving any pain

12   medication, even after I was notified that the anethesa [sic] wear off around 4:30 p.m. (dinner

13   time.)"  *Id.*  The dispute over whether plaintiff complained of pain and the subsequent dispute

14   over why Antipov did not prescribe pain medication for post-surgical pain that plaintiff would

15   reasonably be expected to suffer precludes a grant of summary judgment in Antipov's favor.  A

16   reasonable fact finder could certainly conclude on the evidence presented that Antipov knew that

17   the extractions would result in severe pain requiring treatment with pain medication.  Indeed,

18   plaintiff asserts that he was warned that the injections used in the procedure would soon wear off.

19   Likewise, a fact finder could reasonably conclude that Antipov was aware of the risk of infection

20   following the procedure.  *See* Antipov Decl. at ¶ 10 ("infections are also common side effects, as

21   extraction may allow bacteria to enter the bloodstream").   But, as noted above, Antipov claims

22   that "[s]ince approximately 2009, [he has] performed work as an independent contractor and

23   expert for the California Department of Corrections and Rehabilitation . . . ."  *Id.* at ¶ 2.  Antipov

24   believes that he was therefore not permitted to prescribe medication to inmates.[8]  *See id.* at ¶ 11.

25   However, as an independent contractor, Antipov quite clearly had the authority to prescribe

26   _____

27        [8]  In support of this position, Antipov's reply brief cites his Statement of Undisputed Facts
     numbers 26 and 27 (ECF No. 112-3 at 4), which in turn cite to paragraph 11 of his declaration.
     His declaration, however, fails to cite any authority for the assertion that as a contractor he was
28   not authorized to prescribe medication.

1  medication to inmates:

> Only facility-employed health care staff, *contractors paid to
> perform health services* for the facility, or persons employed as
> health care consultants shall be permitted within the scope of their
> licensure, to diagnose illness or, prescribe medication and health
> care treatment for inmates.  No other personnel or inmate may do
> so.

Cal. Code Regs. tit. 15, § 3354(a) (emphasis added).  Thus, contrary to Antipov's alleged

mistaken belief—one that he appears to have held since 2009—Antipov had the authority to

prescribe medication within the scope of his license to treat plaintiff's pain and risk of infection.

A defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and

disregards that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.

Antipov's choice not to prescribe medication, while seemingly ill-informed, was indisputably

deliberate.  Further, he does not deny that prescribing such medication was medically indicated to

address or treat a serious medical condition.  Instead, the reason he articulates for not doing so is

his erroneous assertion that he lacked authority to prescribe medication even if needed.

Notwithstanding the clear language of section 3354(a), Antipov still insists in his reply

brief that he lacked authority to prescribe medication.  Antipov's stated belief that he could not

prescribe medication even under circumstances that otherwise warrant such treatment raises the

question of whether his deliberate, but ill-informed decision not to prescribe medically necessary

medication can satisfy the test under *Farmer* for deliberate indifference.  That question turns on

fact-specific issues of what Antipov knew not only as to plaintiff's immediate medical needs but

what he knew as to the authority of medical practitioners to respond to those needs, and what

other steps Antipov had available to respond to plaintiff's serious medical needs.  The issue that

requires submission to a jury, however, is not whether Antipov had the authority to prescribe

medication—he did.  Cal. Code Regs. tit. 15, § 3354(a).  Rather, the issue that precludes summary

judgment is whether Antipov was deliberately indifferent for not prescribing any pain medication

or antibiotics after extracting plaintiff's wisdom teeth or otherwise taking steps to assure that such

treatment would be provided.  As noted above,

1
2
3
> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

4

5   *Farmer*, 511 U.S. at 842.  More succinctly: "a trier of fact may infer knowledge from the obvious

6   . . . ."[9]  *Id.* at 844; *see also Harrelson v. Dupnik*, 970 F. Supp. 2d 953, 979 (D. Ariz. 2013) ("The

7   question is whether the risk of harm . . . was so 'obvious' that ignoring it amounted to deliberate

8   indifference.").  Similarly, a fact finder need not ignore evidence that may show it was obvious

9   that a contractor for medical services had the authority for which Antipov claims not to have

10  known.

11         Here, a fair-minded jury could find that not prescribing pain medication or antibiotics

12  after extracting plaintiff's wisdom teeth posed a substantial risk of serious harm to plaintiff, that

13  Antipov had to have known of such an obvious risk, and that Antipov failed to take reasonable

14  measures to abate that risk.  Because those findings could lead a fair-minded jury to return a

15  verdict for plaintiff on the evidence presented, Antipov's motion for summary judgment must be

16  denied.

17                               **b. <u>Ma</u>**

18         Ma also argues that there is "no evidence that he was deliberately indifferent to

19  [plaintiff's] medical needs."  ECF No. 112-2 at 22.  Ma submits a declaration acknowledging that

20  he was the on-call doctor on the evening of August 3.  ECF No. 112-12 ("Ma Decl.") at ¶ 3.

21  However, Ma states that before he even arrived at the medical clinic, he issued an order that

22  plaintiff be seen on the dental line the following morning.  *Id.*  When he arrived at the medical

23  clinic a short time later, he conducted an examination that confirmed plaintiff was awake and

24  orientated; Ma diagnosed plaintiff with somnolence of an unknown etiology.  *Id.* at ¶¶ 4, 5.  Ma

25  also ordered that plaintiff be admitted to OHU, where the nursing staff was to monitor plaintiff's

26
27
28
> [9] While the Supreme Court in *Farmer* adopted a subjective test under which a jury must conclude that Antipov had knowledge of the risk from his failure to act before liability may be imposed, it is for the jury to resolve credibility and decide what he actually knew, and in doing so the jury need not ignore what was obvious.  511 U.S. at 843, n.8.

1    vital signs every thirty minutes for four hours and then every two hours for three hours.  *Id.* at ¶ 6.

2    Ma claims that he reviewed plaintiff's medical chart during the examination.  *Id.* at ¶ 7.  That

3    review indicated that Burns had prescribed Tylenol #3 and Penicillin for plaintiff.  *Id.*  Ma

4    ordered that prescription to continue because neither Burns's order nor plaintiff's medication

5    reconciliation form listed allergies to those medications.  *Id.*

6          On August 4, nursing staff informed Ma that the prison did not have any liquid Tylenol #3

7    available, and that plaintiff's medication reconciliation form identified a drug allergy only to

8    Motrin.  *Id.* at ¶ 11.  Ma therefore prescribed Tylenol #3 in tablet form, three times per day for

9    four days.  *Id.*  Ma did not become involved in plaintiff's medical care again until 2013, when he

10   became plaintiff's primary care physician.  *Id.* at ¶ 13.  In Ma's review of plaintiff's medical

11   chart—both in 2010 and later as his primary care physician—Ma has not seen any indication that

12   plaintiff is genuinely allergic to any medication.  *Id.* at ¶ 14.  According to Ma, stomach

13   discomfort, nausea, and vomiting are fairly common side-effects of taking Tylenol #3 and not

14   necessarily an indication that an individual cannot tolerate the medication.  *Id.* at 8.  Moreover,

15   Vicodin and Tylenol #3 contain the same amount of Tylenol; thus, if an individual does not have

16   an allergic reaction to the Tylenol in Vicodin, he will not have an allergic reaction to the Tylenol

17   in Tylenol #3.  *Id.* at 14-15.[10]

18          Thus, although plaintiff and Ma dispute the extent of Ma's examination and treatment of

19   plaintiff, and whether plaintiff is allergic to Tylenol #3 and Penicillin, these disputes are not

20   material.  There is no evidence to show that Ma was aware of any allergies to either medication

21   yet prescribed it anyway.  Thus, a fair-minded jury could not return a verdict against Ma on the

22   evidence presented.  *Anderson*, 477 U.S. at 248, 252.

23          Further, plaintiff's claim that Ma did not treat him at the OHU is refuted by plaintiff's

24   own verified complaint, which asserts that Ma was the doctor who ordered the Tylenol #3 that he

25   received the night of the extraction.  SAC at 5-6.  Plaintiff cannot create a genuine factual dispute

26   _____

27          [10]  It is unclear whether plaintiff claims an allergy to Vicodin.  *See* Pl.'s Decl. at ¶ 27
     (ECF No. 122 at 80) ("Being that I never taken Vicodin before August 3, 2010 I never had an
     allergic reaction to it nor would I have knowledge that it contains Tylenol.  I was never made

28   aware by any physician that Vicodin contains Tylenol.").

1   by contradicting the verified allegations of his own complaint.  *See also Jones v. Marshall*, 459 F.

2   Supp. 2d 1002, 1013 (E.D. Cal. 2006) (granting defendant summary judgment on a deliberate

3   indifference claim based on defendant's failure to touch or treat plaintiff because there was no

4   evidence that defendant's conduct caused further injury).  Moreover, plaintiff does not dispute the

5   claim that Ma ordered that plaintiff be seen on the dental line the following morning and, shortly

6   after arriving at the OHU, ordered the nursing staff to monitor plaintiff's vital signs.  Such

7   attentive care is inconsistent with plaintiff's claim that Ma was deliberately indifferent to his

8   serious medical needs.  *See Toguchi*, 391 F.3d at 1060 ("Deliberate indifference is a high legal

9   standard."); *Hutchinson*, 838 F.2d at 394.

10      The undisputed evidence indicates that Ma ordered that plaintiff be seen by a dentist the

11   following morning, ordered that plaintiff be admitted to and observed in the OHU, and prescribed

12   the Tylenol #3 that plaintiff received that night.  Of the greatest significance is Ma's statement—

13   which plaintiff cannot dispute—that he did not believe plaintiff was allergic to Tylenol.  *See* Ma

14   Decl. at ¶ 14 ("In my review of [plaintiff's] medical chart, both in 2010 and now as his primary

15   care physician, I have seen no indication of any genuine allergic reaction by [plaintiff] to any

16   medication.").  Under *Toguchi*, Ma's decision to prescribe Tylenol #3 cannot constitute deliberate

17   indifference if Ma did not believe that the medication presented a serious risk of harm to plaintiff.

18   *See Toguchi*, 391 F.3d at 1058 ("Because she did not believe that Cogentin use presented a

19   serious risk of harm to [plaintiff], her conduct cannot constitute deliberate indifference."); *see*

20   *also Murillo v. Thornton*, No. 07-CV-0197 W(POR), 2008 WL 110899, at *4 (S.D. Cal. Jan. 9,

21   2008) (prisoner's allegations that defendant "prescribed him the wrong medication and did not

22   inform him about the side effects," causing plaintiff "severe stomach aches and headaches for

23   four months," failed to state an Eighth Amendment claim).

24      Even believing plaintiff's version of the disputed facts, he has not produced evidence

25   sufficient to establish that Ma was deliberately indifferent to his serious medical needs.

26   Accordingly, Ma's motion for summary judgment must be granted.

27   /////

28   /////

1              **c. McGee**

2              McGee, too, seeks summary judgment on the ground that there is "no evidence that she

3      was deliberately indifferent to [plaintiff's] medical needs." ECF No. 112-2 at 23.  McGee's

4      declaration does not dispute that she met with plaintiff on August 3, that plaintiff had a

5      temperature of 102.2 degrees, or that she contacted the on-call dentist.  McGee Decl. at ¶¶ 3, 4.

6      According to McGee, she measured plaintiff's vital signs in the Triage and Treatment Area after

7      learning that Antipov had extracted plaintiff's wisdom teeth earlier in the day.  *Id.*  Because

8      plaintiff was talking freely, McGee determined that there was no obstruction in plaintiff's airway.

9      *Id.* at ¶ 4.  But McGee was concerned that plaintiff could be bleeding into his airway, so she had

10     plaintiff open his mouth while she inspected the gauze that had been put in place after the

11     extraction.  *Id.* at ¶ 5.  Because the wisdom teeth are located at the very back of the mouth,

12     inspecting the gauze and ensuring that they were tightly packed into place required McGee to

13     insert her fingers far into plaintiff's mouth and to press on the gauze.  *Id.* at ¶ 6.  McGee contends

14     that she performed this task "with as much care and as gently as possible."  *Id.*  McGee then

15     contacted Burns, and he instructed only that ice packs be applied bilaterally.  *Id.* at ¶ 8.

16     According to McGee, plaintiff did not voice any complaints of pain or make any requests for pain

17     medication or antibiotics during the meeting.  *Id.* at ¶ 9.

18             As noted above, plaintiff contends that McGee was disrespectful towards plaintiff, did not

19     offer any medical assistance, and caused plaintiff great pain when she jammed her fingers down

20     plaintiff's throat in search of gauzes that he might have swallowed.  SAC at 5.  Thus, while

21     plaintiff and McGee dispute (1) whether McGee was disrespectful towards plaintiff, (2) whether

22     McGee offered medical assistance, and (3) why McGee put her fingers in plaintiff's mouth and

23     the degree of care she exercised when doing so, those disputes are not material under the

24     substantive law applicable to plaintiff's Eighth Amendment claims.

25             First, the disrespectful behavior alone that is described in plaintiff's amended complaint—

26     "insisting that I was on some illegal drugs" and "continuely [sic] interrogat[ing] me with

27     erroneous questions"—does not amount to deliberate indifference.  *See Oltarzewski v. Ruggiero*,

28     830 F.2d 136, 139 (9th Cir. 1987) ("[v]erbal harassment or abuse . . .  is not sufficient to state a

1   constitutional deprivation under 42 U.S.C. § 1983") (quoting *Collins v. Cundy*, 603 F.2d 825, 827

2   (10th Cir. 1979)).

3         Second, while failing to render medical assistance can amount to deliberate indifference,

4   the undisputed evidence here indicates that McGee did in fact provide medical assistance.

5   Plaintiff's own complaint indicates that McGee contacted the on-call doctor and searched

6   plaintiff's throat for gauzes that he might have become lodged by swallowing during a seizure.

7   SAC at 5.  Plaintiff also does not dispute McGee's claims that she checked plaintiff's vital signs

8   and took his temperature, that the only direction Burns provided McGee was to apply ice packs,

9   or that he received ice packs.  Thus, plaintiff has not shown that McGee was indifferent to

10  plaintiff's serious medical needs for failure to provide medical assistance.  *See Jones v. Marshall*,

11  459 F. Supp. 2d. at 1013.

12        Third, while the parties dispute the manner in which McGee placed her hands in plaintiff's

13  mouth and her specific purpose for doing so (plaintiff characterizes it as "jamm[ing] her fingers

14  down [his] throat") plaintiff has not established that McGee was deliberately indifferent to his

15  serious medical needs when doing so.  Of particular significance is plaintiff's own evidence

16  indicating that McGee was searching for gauzes that plaintiff may have partially swallowed

17  during his seizure.  At most, plaintiff own allegations amount to lack of reasonable care for

18  plaintiff's discomfort while McGee examined his mouth and throat for gauze that might have

19  been lodged in those areas.  The Supreme Court has made clear that deliberate indifference

20  "requires more than ordinary lack of due care." *Farmer*, 511 U.S. at 835 (quoting *Whitley v.

21  Albers*, 475 U.S. 312, 319, (1986)) (internal quotation mark omitted).  Not only does McGee's

22  purpose for the procedure conflict with plaintiff's claim that she was deliberately indifferent, but

23  plaintiff has not produced any evidence that McGee disregard a substantial risk of serious harm.

24  Again, deliberate indifference is a high legal standard requiring more than a showing of medical

25  malpractice or negligence. *Toguchi*, 391 F.3d at 1060.

26        Taking plaintiff's version of the disputed facts regarding McGee as true, he has not

27  produced evidence sufficient to establish that McGee was deliberately indifferent to plaintiff's

28  serious medical needs.  Therefore, McGee's motion for summary judgment must be granted.

1

####   d. **Maciel**

2        Maciel seeks summary judgment on the ground that there is "no evidence that he was

3  deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 24.  In his declaration,

4  he describes examining plaintiff on five occasions between August 10 and October 21, 2010.

5  ECF No. 112-11 ("Maciel Decl.") at ¶¶ 3, 8, 11, 13, 15.[11]  Maciel states that he prescribed

6  Tylenol, 325 mg after examining plaintiff on August 10.  *Id.* at ¶¶ 3, 5.  During that examination,

7  plaintiff told Maciel that he was allergic to Motrin; Maciel then reviewed plaintiff's dental health

8  history record and confirmed that Motrin was listed as a drug allergy.  *Id.* at ¶ 5.  However, at that

9  time Tylenol and Penicillin were not so listed; according to Maciel's declaration, allergies to

10 Tylenol and Penicillin were added when the form was updated on August 20, 2010.[12]  *Id.*

11       Maciel claims that plaintiff did complain of "slight pain" from the extraction and that the

12 Tylenol #3 was causing an upset stomach; however, plaintiff did not claim to be allergic to

13 Tylenol during Maciel's examination.  *Id.* at ¶¶ 3, 5.  Rather, plaintiff claimed only that Tylenol

14 #3 made him sick to his stomach.  *Id.*  at ¶ 5.  Maciel explains that stomach irritation is a "fairly

15 common side-effect" of Tylenol #3 and is not an indication of an allergy to the medication.  *Id.* at

16 ¶ 4.  Maciel also claims that "[n]o allergic symptoms were present in [plaintiff] during my

17 examination of him . . . ."  *Id.*  Maciel prescribed the less powerful pain medication, Tylenol, 325

18 mg, rather than Tylenol #3 because he believed it would still relieve the pain but be less likely to

19 cause plaintiff stomach irritation.  *Id.* at ¶ 5.

20       In response to Maciel's motion, plaintiff contends that his Unit Health Record has listed

21 his allergies to Tylenol, Penicillin, Aspirin, and Motrin since he arrived in prison.  Pl.'s Decl. at

22 ¶ 30 (ECF No. 122 at 81).[13]  He also contends that he told both Maciel and Downie at the August

23

---

24       [11]  Plaintiff's only complaint with respect to Maciel, however, appears to be that Maciel
   prescribed the bag of Tylenol that plaintiff received on August 10.  SAC at 7.

25       [12]  As discussed below, defendant Downie states that at an August 20 meeting he asked
26 plaintiff to review and update the dental health history record plaintiff had completed on August
   3.  According to Downie, plaintiff had previously identified only Motrin as an allergy drug but he
27 added Tylenol and Penicillin at the August 20 meeting.

28       [13]  Again, plaintiff has not submitted this Unit Health Record to the court.

1  10 appointment that he was allergic to the Tylenol #3 that he had been prescribed for the

2  preceding week, and that he showed them "the rashes and hives that were all over [his] neck,

3  arms, chest, stomach and back

4  . . . ."  *Id.* at ¶¶ 38, 40.

5      Even if plaintiff had produced the Unit Health Record listing his allergy to Tylenol on

6  August 10, and even if he showed Maciel the rashes and hives that he believes were caused by his

7  consumption of Tylenol #3, the undisputed evidence indicates that Maciel did not believe that the

8  Tylenol presented a serious risk of harm to plaintiff.  *See* Maciel Decl. at ¶¶ 4, 5 (stating that he

9  did not observe any allergic symptoms and "believed that the less powerful pain medication—

10  Tylenol rather than Tylenol #3—would still relieve the pain but would also be less-likely to cause

11  [plaintiff] the stomach irritation which he complained about").  As with plaintiff's claim against

12  Ma, this fact is critical under *Toguchi*.  Moreover, this is not an instance in which Maciel "knew

13  of a substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842.

14  When plaintiff informed Maciel of his allergy to Motrin, Maciel "consulted [plaintiff's] dental

15  health history record and confirmed it was listed as a drug allergy."  Maciel Decl. at ¶ 5.  The

16  dental health history record did not at that time list Tylenol or Penicillin as a drug allergy.  *Id.*

17  Because Maciel did not believe that prescribing plaintiff Tylenol would present a serious risk of

18  harm to plaintiff—a belief based on his examination of plaintiff and review of plaintiff's dental

19  health history record—Maciel's conduct cannot amount to deliberate indifference.  *See Toguci*,

20  391 F.3d at 1058.

21      Even believing plaintiff's version of the disputed facts, he has not produced evidence

22  sufficient to establish that Maciel was deliberately indifferent to his serious medical needs.

23  Therefore, Maciel is entitled to summary judgment.

24                  **e. <u>Downie</u>**

25      Downie also seeks summary judgment on the ground that there is "no evidence that he

26  was deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 25.  Downie, a

27  dentist, states in his declaration that he recalls seeing plaintiff on August 20, but not on August

28  /////

10.  ECF No. 112-8 ("Downie Decl.") at ¶¶ 4, 5.[14]  Downie contends that at the August 20 meeting he asked plaintiff to review and update a dental health history record that plaintiff had completed on August 3.  *Id.* at ¶ 5.  Although plaintiff previously identified an allergy only to Motrin, plaintiff added Tylenol and Penicillin before signing the form on August 20.  *Id.* at ¶¶ 5, 6.[15]  Plaintiff complained of pain at the appointment, and Downie considered prescribing Aspirin until plaintiff claimed that he was also allergic to that medication.  *Id.* at ¶ 8.  Downie doubted the legitimacy of this claim:  not only had plaintiff not claimed an allergy to Aspirin on his dental health history record—which plaintiff had just updated at the beginning of the appointment—but plaintiff described his allergic symptom to Aspirin as stomach discomfort.  *Id.*  According to Downie, stomach discomfort is not an indication of a drug allergy.  *Id.*  Downie did not observe any allergic symptoms during his examination of plaintiff.  *Id.* at ¶ 9.  Notwithstanding his skepticism, Downie reviewed plaintiff's medical chart and contacted plaintiff's primary care physician to determine whether plaintiff's alleged allergies were genuine.  *Id.* at ¶¶ 9, 10.  Downie eventually decided to prescribe Salsalate, which is "commonly prescribed to patients who cannot take Aspirin," and plaintiff did not claim an allergy to it.  *Id.* at ¶ 11.  According to Downie, Salsalate and Aspirin are not the same medication, and Salsalate does not contain Aspirin.  *Id.*

In his objections, Downie argued that "no liquid diet was necessary and [] no rational trier of fact could find that [he] should have ordered one when [plaintiff] had actually been gaining weight since he had last been examined."  ECF No. 127 at 2.  In support of this claim, Downie cites medical records that indicate plaintiff weighed 155 pounds on August 10 and 165 pounds on August 20.  *Id.* (citing Maciel Decl., Ex A and Downie Decl., Ex. B).

Thus, in comparing their respective versions of the August appointments, plaintiff and Downie dispute whether they even met on August 10, whether Salsalate is an alternative for someone who is allergic to Aspirin, whether Salsalate contains Aspirin, and whether Downie

---

[14]  According to Downie, plaintiff's medical chart indicates that plaintiff met with a different dentist on August 10.  Downie Decl. at ¶ 4.  Downie does not otherwise acknowledge the allegations stemming from the alleged meeting on August 10.

[15]  Downie reviewed and signed that form, which is attached to his declaration as an exhibit.  Downie Decl. ("Exhibit A").

1    should have ordered plaintiff a liquid diet for plaintiff.   For the reasons discussed below, it is

2    recommended Downie's motion for summary judgment with respect to the allegations regarding

3    his prescription for pain medication granted, but his motion as to the allegations regarding his

4    failure to order plaintiff a liquid diet be denied.

5         For purposes of this motion, the court must take as true plaintiff's claim that Downie was

6    present on August 10 and observed rashes and hives on plaintiff's body.  *See Anderson*, 477 U.S.

7    at 249, 255; *Matsushita*, 475 U.S. at 587.  However, even assuming those facts, the only evidence

8    of plaintiff's purported allergic reaction to Tylenol and Penicillin is his own lay testimony.  *See*

9    *Hardy v. 3 Unknown Agents*, 690 F. Supp. 2d 1074, 1086 (C.D. Cal. 2010) (sustaining an

10   objection to plaintiff's statement as improper lay testimony "to the extent that plaintiff asserts that

11   the allergic reaction was caused by the [medication]").  There is nothing in the medical records

12   before the court to establish a diagnosis or medical finding that plaintiff in fact has or had an

13   allergy to either medication.  Moreover, plaintiff claims the bag of Tylenol that he received on the

14   evening of August 10 was prescribed by Maciel, not Downie.  Pl.'s Decl. at ¶ 42 (ECF No. 122 at

15   83).  Furthermore, similar to plaintiff's claims against Ma and Maciel, his deliberate indifference

16   claim against Downie fails because Downie did not believe that Salsalate presented a serious risk

17   to plaintiff's health.  *See Toguchi*, 391 F.3d at 1058.  Even if, as plaintiff claims, Salsalate

18   contains Aspirin and is not an alternative for someone who is allergic to Aspirin—a point for

19   which plaintiff has no expertise—Downie makes clear that he did not believe plaintiff's alleged

20   allergy to Aspirin was legitimate and provides cogent reasons why he did not believe plaintiff.

21   *See* Downie Decl. at ¶ 8.  Accordingly, Downie's motion for summary judgment as to the

22   allegations regarding Downie's prescription of pain medication should be granted.

23        As to the other allegations concerning Downie, his objections raise arguments for the first

24   time after the close of briefing on the motion and after the court's earlier analysis of the issues.

25   The purpose of the objection period is not to brief the merits of the motion in the first instance.

26   Defendants already had the opportunity to brief their motion.  However, even considering the

27   evidence and argument that Downie raises for the first time in his objections, the court must deny

28   Downie's motion for summary judgment with respect to the allegations regarding his failure to

1  order a liquid diet for plaintiff.[16]  Downie's specific argument is that "[t]he evidence before the

2  court establishes that no liquid diet was necessary and that no rational trier of fact could find that

3  Downie should have ordered one when [plaintiff] had actually been gaining weight since he had

4  last been examined."  ECF No. 127 at 2.[17]  But when Downie says "the evidence before the

5  court," he is referring to his evidence to the exclusion of plaintiff's evidence.  On Downie's

6  motion for summary judgment, however, the court not only considers plaintiff's evidence but also

7  believes that evidence for purposes of the motion.  *See Anderson*, 477 U.S. at 249, 255;

8  *Matsushita*, 475 U.S. at 587.  Contrary to Downie's claim that the evidence "establishes that no

9  liquid diet was necessary," plaintiff's evidence indicates that on August 10, he informed Downie

10  of the "severe pain [he] was in, how [he] was unable to chew nor swallow any food since before

11  the oral surgery, and all the stomach pain [he] had due to this."  Pl.'s Decl. at ¶ 41 (ECF No. 122

12  at 83).  Plaintiff's evidence also indicates that on August 20, Downie observed plaintiff's weight

13  loss and that plaintiff was unable to open his mouth for examination because it caused him pain,

14  and plaintiff again informed Downie that he had not eaten anything since the day of the

15  extraction.  SAC at 8-9.[18]

16  /////

17  /////

---

18  [16]  Indeed, the court is not required to consider the evidence and argument presented for
19  the first time in Downie's objections.  *See United States v. Howell*, 231 F.3d 615, 621 (9th Cir.
20  2000) ("[A] district court has discretion, but is not required, to consider evidence presented for
    the first time in a party's objection to a magistrate judge's recommendation."); *cf. Brown v. Roe*,
21  279 F.3d 742, 745 (9th Cir. 2002) (explaining that a functionally illiterate pro se petitioner's
    failure to raise an argument before filing objections to a findings and recommendations is more
22  excusable than the failure of "the litigant in *Howell*, who was represented by counsel . . . .").

23  [17]  Although the medical records noting the fluctuations in plaintiff's weight were
    submitted with the various declarations that defendants submitted in support of their motion for
24  summary judgment, *see* ECF Nos. 112-8, 112-9, 112-1, the claim that Downie did not order a
    liquid diet because of the fluctuations in plaintiff's weight is one that defendants did not present
25  until filing their objections.

26  [18]  The allegations of a verified complaint may serve as an affidavit for purposes of
27  summary judgment if they are based on personal knowledge and set forth the requisite facts with
    specificity.  *See Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1022 (9th Cir.
28  2010).

1    The argument that Downie did not order a liquid diet because plaintiff had been gaining

2    weight is unconvincing.  The medical records do indicate that plaintiff weighed 155 pounds on

3    August 10 and 165 pounds on August 20.  *See* Maciel Decl., Ex. A; Downie Decl., Ex. B.  Thus,

4    Downie's argument superficially appears reasonable.  But Downie fails to mention in his

5    objections that the medical records also indicate that plaintiff weighed 174 pounds on August 3,

6    the day of the extraction.  *See* Antipov Decl., Ex. A (ECF No. 112-9 at 7).  If the medical records

7    are accurate—an assumption underlying Downie's argument—then plaintiff lost nineteen pounds

8    in the seven days after the extraction.  Thus, Downie is essentially arguing that he could not have

9    been deliberately indifferent to plaintiff's serious medical needs by not ordering a liquid diet

10   because plaintiff had gained back ten of the nineteen pounds that plaintiff lost in the week after

11   the extraction.  A jury may well agree with Downie, but it also may well determine instead that a

12   more reasonable baseline is the loss of nineteen pounds in light of plaintiff's claim that he had a

13   serious medical need for, and sought, a liquid diet but was refused, and that denial put him at

14   unreasonable risk and unnecessary suffering.  In short, the argument does not warrant summary

15   judgment in favor of Downie.

16   Additionally, as noted above, Downie and plaintiff dispute whether they met on August

17   10.  If the jury believes plaintiff's evidence, Downie will have to convince the jury that he was

18   not deliberately indifferent for not ordering a liquid diet for plaintiff on August 10 when plaintiff

19   had lost nineteen pounds in the preceding week.  Again, the court does not determine witness

20   credibility on summary judgment; rather, it believes the non-moving party's evidence and draws

21   inferences most favorably for that party.  *Anderson*, 477 U.S. at 249, 255; *Matsushita*, 475 U.S. at

22   587.  Downie's objections emphasize that, under *Matsushita*, the court is to consider "the record

23   taken as a whole" when determining if there is a genuine issue of material fact.  He further argues

24   that no rational trier of fact, considering the record as a whole, would find for plaintiff with

25   respect to the liquid diet allegations against Downie.  Contrary to Downie's argument, the record

26   does not undermine plaintiff's claim that he was unable to eat after the extraction (or at least not

27   to the point that no rational trier of fact could find for plaintiff).  In fact, with respect to plaintiff's

28   /////

26

1  alleged request on August 10, the record actually corroborates plaintiff's claim; again, he lost

2  nineteen pounds in the week preceding that alleged meeting with Downie.

3      Downie has shown no basis for granting summary judgment on this claim.  There is a

4  genuine dispute whether Downie met with plaintiff on August 10.  If a jury believes plaintiff

5  testimony it will then have to take into account that request and the request on August 20.  A fair-

6  minded jury could—on the undisputed evidence that Downie did not order a liquid diet for

7  plaintiff on either August 10 or August 20 despite plaintiff's pain, weight loss, and inability to

8  chew and swallow food after the extraction on August 3—return a verdict for plaintiff on his

9  deliberate indifference claim against Downie.[19]  *See Anderson*, 477 U.S. at 248, 252; *see also*

10 *Foster v. Runnels*, 554 F.3d 807, 815 n.5 (9th Cir. 2009) ("This conclusion, that the deliberate and

11 unnecessary withholding of food essential to maintain normal health can violate the Eighth

12 Amendment, is well supported by case law.").

13      Thus, it is recommended that Downie's motion for summary be granted as to plaintiff's

14 allegations regarding Downie's prescription of pain medication, but denied as to plaintiff's

15 allegations regarding Downie's failure to order a liquid diet on August 10 and August 20.

16                              **f.  Park**

17      Park, too, seeks summary judgment on the ground that there is "no evidence that he was

18 deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2 at 26.  Park states in his

19 declaration that he was the on-call dentist on August 24 and 25.  ECF No. 112-10 ("Park Decl.")

20 at ¶¶ 3, 7.  In the evening on both of those days, Park received a telephone call informing him that

21 plaintiff was experiencing pain three weeks after having his wisdom teeth extracted and that

22 plaintiff was claiming an allergy to Tylenol, even though plaintiff's medication administration

23 record listed an allergy only to Motrin.  *Id.*  On August 24, Park ordered a one-time dosage of

24 Morphine, that plaintiff apply ice to the right side of his face, and that plaintiff be scheduled for

25 an appointment in the dental clinic the following day.  *Id.* at ¶ 4.  Park did not order an antibiotic

26 ───────────────

27      [19]  The December 19, 2014 Findings and Recommendations incorrectly suggested that Downie did not dispute that plaintiff's was suffering from a "painful infection."  Downie's Objections reiterated that he "did not find the presence of any infection during his examination on

28 August 20, 2010."  ECF No. 127 at 3.  Downie does dispute plaintiff's assertion in that regard.

1   at that time because he expected plaintiff to be seen at the dental clinic the following day.  *Id.*  On

2   August 25, Park learned that plaintiff was unable to attend the dentist appointment because he had

3   conflicting medical appointments.  *Id.* at ¶ 8.  Park therefore ordered another dosage of Morphine

4   and the antibiotic Erythromycin.  *Id.* at ¶¶ 9-10.  Park ordered the Erythromycin because plaintiff

5   claimed to be allergic to Penicillin.  *Id.* at ¶ 10.  Park does not dispute that the August 25

6   physician's order includes an order for Tylenol #3, but he does not recall ordering that medication

7   and suspects it was included by mistake.  *Id.* at ¶ 13.

8        Plaintiff does not dispute any part of Park's account (including Park's claim that the order

9   for Tylenol #3 was included by mistake), and plaintiff's deliberate indifference claim against Park

10  appears to be based solely on the prescription for Tylenol #3.  *See* SAC at 11; Pl.'s Decl. at ¶ 57

11  (ECF No. 122 at 84).  The issue, then, is whether Park's mistake amounts to deliberate

12  indifference.

13       "[D]eliberate indifference entails something more than mere negligence," *Farmer*, 511

14  U.S. at 835, and mistakes by medical professionals are not sufficient to meet the high legal

15  standard, *see Jones v. Sahota*, 570 F. App'x 638, 638 (9th Cir. 2014) (citing *Toguchi*, 391 F.3d at

16  1057-58, 1060); *Ross v. McGuinness*, 471 F. App'x 608, 609 (9th Cir. 2012).  Moreover, even if

17  the Tylenol #3 prescription was not a mistake, Park—similar to Ma, Maciel, and Downie—

18  believes "there is no evidence of [plaintiff] suffering [ ] a genuine allergic reaction at any time."

19  Park Decl. at ¶ 13.  Thus, because he did not believe that the Tylenol #3 that he prescribed

20  presented a serious risk of harm to plaintiff, Park's conduct cannot amount to deliberate

21  indifference.  *Toguchi*, 391 F.3d at 1058.  Furthermore, Park's mistake was of no consequence, as

22  plaintiff has not even alleged that he consumed the Tylenol #3 that Park prescribed.

23       Park was not deliberately indifferent for mistakenly prescribing Tylenol #3—a mistake

24  without any consequences.  Therefore, Park is entitled to summary judgment.

### g.  Grinde

26       As with the other defendants, Grinde seeks summary judgment on the ground that there is

27  "no evidence that he was deliberately indifferent to [plaintiff's] medical needs."  ECF No. 112-2

28  at 26.  Grinde, the nurse who approved plaintiff's return to B-facility, describes speaking with

1  plaintiff on the evening of August 25.  ECF No. 112-13 ("Grinde Decl.") at ¶ 5.  Upon learning of

2  plaintiff's pain and the fact that plaintiff had missed his dental appointment that day, Grinde

3  contacted Park, the on-call dentist.  *Id.* at ¶¶ 4-5.  Grinde informed Park that plaintiff was

4  experiencing pain but was unable to see a dentist that day due to conflicting medical

5  appointments.  *Id.* at ¶ 5.  Grinde also informed Park that although plaintiff was claiming to be

6  allergic to Motrin and Tylenol, plaintiff's medication administration record indicated only the

7  allergy to Motrin.  *Id.* at ¶ 6.  According to Grinde, Park ordered a single dosage of Morphine,

8  Tylenol #3, an antibiotic, and that plaintiff be seen in the dental clinic the following day.  *Id.* at ¶

9  7.  Park initially ordered Penicillin, but instead prescribed Erythromycin after learning that

10  plaintiff claimed to be allergic to Penicillin.  *Id.*  Grinde prepared the "physician's orders"

11  document that Park signed later.  *Id.* at ¶ 8.

12       Plaintiff's deliberate indifference claim against Grinde is based on (1) Grinde's approving

13  of plaintiff to return to B-facility after plaintiff's heart murmur appointment without any

14  treatment for his swollen face and extreme pain, (2) Grinde's statement that he could not do

15  anything for plaintiff because plaintiff was just trying to get drugs, and (3) the August 25

16  prescription for Tylenol #3.  Even believing plaintiff's evidence, plaintiff has not established that

17  Grinde was deliberately indifferent to his serious medical needs.

18       First, plaintiff does not dispute that Grinde contacted and informed Park of plaintiff's pain

19  and drug allergies before preparing the "physician's orders," nor does plaintiff contend that he did

20  not receive the prescribed medication.  Second, accusing plaintiff of feigning pain to get drugs

21  does not amount to deliberate indifference to plaintiff's serious medical needs.  *Oltarzewski*, 830

22  F.2d at 139.  Third, as noted above, the mistaken Tylenol #3 prescription of August 25 was of no

23  consequence, as plaintiff has not even alleged that he consumed that mistakenly prescribed

24  medication.  Thus, even believing plaintiff's version of the disputed facts, he has not produced

25  evidence sufficient to establish that Grinde was deliberately indifferent to his serious medical

26  needs.  Therefore Grinde is entitled to summary judgment.

27  /////

28  /////

1

### 3. __Qualified Immunity__

2          Antipov and Downie contend that they are entitled to qualified immunity.  ECF No. 112-2

3    at 28.[20]

4          Qualified immunity protects government officials from liability for civil damages where a

5    reasonable person would not have known that their conduct violated a clearly established right.

6    *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).  "In resolving questions of qualified

7    immunity at summary judgment, courts engage in a two-pronged inquiry."  *Tolan v. Cotton*, ___

8    U.S. ___, ___, 134 S. Ct. 1861, 1865 (2014) (per curiam).  "The first asks whether the facts,

9    'taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct

10   violated a federal right.'"  *Id.* (internal bracketing omitted) (quoting *Saucier v. Katz*, 533 U.S.

11   194, 201 (2001)).  "The second prong of the qualified-immunity analysis asks whether the right in

12   question was 'clearly established' at the time of the violation."  *Tolan*, 134 S. Ct. at 1866 (quoting

13   *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  A plaintiff invokes a "clearly established" right when

14   "the contours of the right [are] sufficiently clear that a reasonable official would understand that

15   what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. at 640.  "The salient

16   question is whether the state of the law at the time of an incident provided fair warning to the

17   defendants that their alleged conduct was unconstitutional."  *Tolan*, 134 S. Ct. at 1866 (internal

18   bracketing and quotation marks omitted).

19         Antipov's assertion of qualified immunity is based on his contention that the care he

20   provided plaintiff was reasonable and therefore did not violate a plaintiff's Eighth Amendment

21   rights.  As explained above, there are triable issues of material fact with respect to whether

22   Antipov acted with deliberate indifference to plaintiff's serious medical needs in violation of the

23   Eighth Amendment.  Those same issues preclude summary judgment on Antipov's assertion of

24   qualified immunity.  Moreover, at the time of the alleged constitutional violations in this case,

25   "the general law regarding the medical treatment of prisoners was clearly established," and "it

26

27         [20]  Because it is recommended that summary judgment be granted as to the Eighth
     Amendment claims against Grinde, Ma, Maciel, McGee, and Park, a discussion of qualified
28   immunity as to those defendants is unnecessary.

1   was also clearly established that [prison staff] could not intentionally deny or delay access to

2   medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citing *Hamilton v. Endell*,

3   981 F.2d 1062, 1066 (9th Cir. 1992) and *Estelle*, 429 U.S. at 104-05)).

4          Downie's assertion of qualified immunity is also unconvincing.  As explained above,

5   Downie does not dispute the fact that he denied plaintiff's request for a liquid diet, even after

6   learning that plaintiff had not eaten anything in the seventeen days before the August 20

7   appointment.  Not only does such undisputed evidence show a violation of a constitutional right,

8   but that right was clearly established when Downie violated that right.  *See Foster*, 554 F.3d at

9   815 ("There is no question that an inmate's Eighth Amendment right to adequate food is clearly

10  established.").

11         Neither Antipov nor Downie are entitled to qualified immunity.

12         **B.      Plaintiff's Counter-Motion for Summary Judgment**

13         Plaintiff filed an opposition to defendants' motion for summary judgment and a counter-

14  for summary judgment.  ECF No. 122.  In their reply, defendants argue that the court should deny

15  plaintiff's counter-motion as untimely and construe it only as an opposition to defendants'

16  motion.  ECF No. 125 at 12.  Although defendants correctly point out that the deadline for filing

17  dispositive motions was March 24, 2014, *see* ECF No. 101, and that plaintiff did not file his

18  counter-motion for summary judgment until July 31, 2014,[21] *see* ECF No. 122, plaintiff's motion

19  is considered on its merits and is denied.  Plaintiff's motion is denied not because it is untimely,

20  but because it is a counter-motion for summary judgment in name only.

21         Only in conclusory statements at the beginning and end of plaintiff's counter-motion does

22  plaintiff argue that the court should grant summary judgment in his favor.  *See* ECF No. 122 at 5,

23  27.  He makes no claim that there is an absence of a genuine issue of material fact as to the facts

24  which would entitle him to judgment in his favor, *see Celotex*, 477 U.S. at 323, and seems to

25  _____

26         [21] Defendants emphasize that while the court granted plaintiff an extension of time to file
    his opposition, *see* ECF Nos. 114, 120, the court did not grant plaintiff an extension to file a
27  dispositive counter-motion for summary judgment.  *But see* E.D. Cal. L.R. 230(e) (explaining that
    counter-motions "shall be served and filed in the manner and on the date prescribed for the filing
28  of opposition").

1   misunderstand the standard for summary judgment, *see* ECF No. 122 at 9 (arguing that "[t]he

2   issue for the court is whether plaintiff has *sufficiently alleged* that individual defendants were

3   deliberately indifferent to his medical needs.") (emphasis added).  First, plaintiff is not simply

4   opposing a Rule 12(b)(6) motion to dismiss for failure to state a claim.  Federal Rule of Civil

5   Procedure 56 and *Celotex* require more than sufficient allegations.  Secondly, as to his counter-

6   motion for summary judgment plaintiff overlooks the point that it is he, not the defendants, who

7   bear the ultimate burden of proof as to each of the elements of his claims.  For the same reasons

8   discussed above in the context of defendants' motions, plaintiff has produced no evidence

9   indicating that he can meet that burden.  Because plaintiff has not met his burden of providing a

10  properly supported motion for summary judgment, his "counter motion" for summary judgment

11  must be denied.[22]

12  **IV.   ORDER AND RECOMMENDATION**

13          Accordingly, it is hereby ORDERED that the December 19, 2014 findings and

14  recommendations are VACATED.  Further, it is hereby RECOMMENDED that (1) defendants'

15  motion for summary judgment (ECF No. 112) be granted as to defendants Grinde, Ma, Maciel,

16  McGee, and Park, but granted in part and denied in part as to defendant Downie and denied as to

17  defendant Antipov, (2) plaintiff's counter-motion for summary judgment (ECF No. 122) be

18  denied as to all defendants.[23]

19          These amended findings and recommendations are submitted to the United States District

20  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

21  days after being served with these amended findings and recommendations, any party may file

22  written objections with the court and serve a copy on all parties.  Such a document should be

23  captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file

24  objections within the specified time may waive the right to appeal the District Court's order.

25          [22]  This resolution moots defendants' request for the opportunity to respond to the merits
26  of plaintiff's counter-motion.  *See* ECF No. 125 at 12.

27          [23]  If the court adopts this recommendation, the action will proceed solely as to plaintiff's
    Eighth Amendment claims against defendants Antipov and Downie.  As to Downie, plaintiff's
28  claim is limited to the allegations regarding his request to be placed on a liquid diet on August 20.

1   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

2   1991).

3   DATED:  February 12, 2015.

4                                                    EDMUND F. BRENNAN
                                                    UNITED STATES MAGISTRATE JUDGE